| | |
|---|---|
| THE STANLEY M. HERZOG FOUNDATION,<br><br>     Plaintiff,<br><br>v.<br><br>U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; CHARLOTTE BURROWS, Chair of the Equal Employment Opportunity Commission, in her official capacity,<br><br>     Defendants. | No. 4:24-cv-00651 |

## COMPLAINT

## PRELIMINARY STATEMENT

1.      In our nation's ongoing cultural, religious, political, and legal debate over abortion, there are few points of agreement. Here is one: after *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), the question of government regulation of abortion was returned to the political branches. Now, released from the framework of *Roe v. Wade*, the States and Congress are grappling with abortion anew. Our country's sharply divided views on abortion led some legislatures to better protect the pre-born members of our national community than the *Roe* regime. Some have been far less protective, even recasting the abortion procedure as a nearly absolute entitlement for women to end the lives of the pre-born under their protection. Either way, abortion permeates our national conversation, including every debate over new laws covering pregnancy and childbirth. As *Dobbs* intended, abortion policy is now being set through democratic deliberation and compromise. Except at the U.S. Equal Employment Opportunity Commission.

1

2.     The Stanley M. Herzog Foundation, a religious organization, brings this lawsuit to compel the EEOC to follow the Constitution, federal law, and the very rule of law. In June of 2024, the EEOC bypassed democratic debate and reversed recent action by Congress by imposing its own Rule, a nationwide abortion-accommodation mandate covering most employers, including even religious organizations like the Foundation. Specifically, the EEOC determined that when Congress passed a law filling a gap in protections for pregnant workers by requiring most employers to provide accommodations for any "pregnancy, childbirth, or related medical conditions," Congress had meant to include "abortion," a voluntary medical *procedure*, as a "medical condition[]" that was "related to" "pregnancy" and "childbirth." The EEOC decided that, in the charged environment immediately after *Dobbs*, Congress—having never mentioned "abortion" or the termination of pregnancy anywhere in the statute—had nonetheless given the EEOC the power to decide for itself the major question of whether a vast swath of employers and employees would now be subject to an abortion accommodation mandate in the workplace.

3.     The EEOC is wrong for several reasons. First, Congress delegated no power to the EEOC to define its statutory term, "medical conditions." Second, even if that power had been delegated, the EEOC lacked the power to exercise it in a way that contradicts and violates the statutory text. Third, even if the EEOC's reading did not violate the text, it is impossible to believe that Congress would have silently delegated such a momentous question to the EEOC. Fourth, even if the plain text had not been limited by the term, "medical conditions," Congressional intent was clear, and the EEOC acted despite overwhelming evidence that Congress considered whether to extend protection to pregnancy-ending procedures like abortion, and in a vote joined by a range of pro-life voices, resolutely rejected doing so.

2

4.      Further, the EEOC reinterpreted Congress's religious exemption to be nearly meaningless, providing little to no protection for religious organizations like the Foundation whose religious identity and exercise consists of discouraging and prohibiting abortion and pro-abortion advocacy. The EEOC's Rule, then, violates the Foundation's rights under the Religious Freedom Restoration Act and the First Amendment.

5.      The EEOC's bold, lawless usurpation of power is nearly unprecedented. It must be repudiated in no uncertain terms. The Foundation asks this Court to declare invalid the EEOC's Rule including abortion as a "related medical condition[]" to "childbirth" and "pregnancy," and eviscerating the otherwise-applicable Title VII religious exemption for employers like the Foundation. The Court should also award injunctive relief, fees, and costs.

## VENUE AND JURISDICTION

6.      The Court has original jurisdiction because this is a civil action "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

7.      Venue is proper in this district because Plaintiff is headquartered in and has its principal place of business in Smithville, Missouri. 28 U.S.C. § 1391.

8.      This Court has the authority to grant Plaintiff the declaratory and injunctive relief it requests pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 703-06, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(c).

## PARTIES

9.      Plaintiff The Stanley M. Herzog Foundation ("Herzog Foundation") is a Christian nonprofit, nonpartisan organization with its principal place of business in Smithville, Missouri. It

exists to catalyze and accelerate the development of quality Christ-centered K-12 education. The Foundation is governed by a board of directors and has over 15 employees.

10. Defendant the U.S. Equal Employment Opportunity Commission ("EEOC") is the federal agency that created the abortion accommodation mandate challenged in this case. It has authority to enforce the abortion accommodation mandate, PWFA, and Title VII against private employers and issue right-to-sue letters to private individuals to enforce the same against their employers.

11. Charlotte Burrows is the current chair of the EEOC. She is sued in her official capacity alone.

## BACKGROUND

### I. Herzog Foundation's sincere religious beliefs and personnel policies.

12. The Herzog Foundation was founded by Stanley M. Herzog, known to his friends and family as "Stan." Stan was "a Christian businessman, philanthropist, father, and grandfather." Herzog Foundation, *About Stanley M. Herzog*, https://herzogfoundation.com/our-founder/ (last visited September 12, 2024). He carried several critical values throughout his life. He "believed in an America where faith, family values, and hard work lead to spiritual and societal prosperity. A precious and critical piece to realizing this belief is the education of America's children." *Id*. Upon Stan's death in 2019, he left his wealth in a trust to the Foundation for the purpose of promoting quality Christian education. His legacy and this purpose live on in the Foundation's mission, vision, programs, and statement of faith today.

13. The Foundation's vision states, in part: "Herzog Foundation exists to catalyze and accelerate the development of quality Christ-centered K-12 education. Our vision is for families and culture to flourish through quality Christian education." Herzog Foundation, *About Herzog Foundation*, https://herzogfoundation.com/about/, (last visited Sept. 12, 2024).

4

14.     The Foundation accomplishes its mission by "seek[ing] to identify areas of growth and gaps in the Christian education space in order to catalyze effective and scalable programs across the nation. Our mission is lived out by providing programs such as online content, up-to-date news, training and events, grants, and hands-on organizational improvement initiatives." Herzog Foundation, *About Herzog Foundation*, https://herzogfoundation.com/about/#our-mission, (last visited Sept. 12, 2024).

15.     The Herzog Foundation carries out a number of Christian programs to effectuate these goals.

16.     For example, the Foundation publishes *The Lion*, a Christian news source that publishes articles on Christian education, faith, and other similar topics. *The Lion: A Publication by the Herzog Foundation*, https://readlion.com/, (last visited Sept. 12, 2024).

17.     The Foundation also publishes Christian content on its podcast and on its social media to promote its Christian beliefs.

18.     Every month at its satellite location, the Foundation also hosts the Herzog Foundation Institute, which offers educational training, events, and conferences for Christian educators, leaders and organizations. The Foundation also hosts other Christian education training events across the county throughout the year.

19.     It offers other religious events at its facility for Christian educators and members of the public, such as its Spiritual Formation Training Retreat in October 2024.

20.     Every year the Foundation hosts an event at the Museum of the Bible in Washington, D.C., where it awards the "Christian Teacher of the Year" award.

21.     The Foundation also offers an online resource, called SchoolBox, to aid Christian entrepreneurs in establishing Christian schools, micro schools, and cooperatives.

22.     The Foundation offers similar programs for Christian homeschool organizations and families through HF Homeschool.

23.     These are just a handful of the programs the Foundation offers to promote its Christian mission.

24.     Given the centrality of the Foundation's Christian values and purpose, the Foundation requires that all employees and board members share its Christian beliefs.

25.     Employees must review the Herzog Foundation's Employee Handbook, which outlines the Foundation's beliefs, and sign a statement attesting that the employees affirm and will conduct themselves in accord with these beliefs.

26.     The Herzog Foundation's Employee Handbook begins with a welcome from the Foundation President, which provides in pertinent part: "Welcome! You have just joined a dedicated Christian foundation, on a mission to catalyze and accelerate the development of quality Christ-centered K-12 education so that families and culture flourish. . . . The Foundation hires exceptional personnel who enjoy using their skills and giftedness to serve others through the Foundation's mission." **Ex. A, Employee Handbook 1.0, at 1**.

27.     The Handbook outlines the Foundation's mission statement, Christian Statement of Faith, and conduct expectations for employees based on those Christian beliefs. These statements are a "policy" to which employees agree to abide. **Ex. A, Employee Handbook 2.0, at 2-3**. Section 2.0 of the Handbook titled "*The Foundation's Christian Beliefs, Values, and Conduct Expectations*" enumerates the policy. ***Id.* at 2-3**. The policy "also exists as a stand-alone document entitled *Herzog Foundation Statement of Faith, Statement of Christian Values, and Expectations of Its Employees*." ***Id.* at 3**.

6

28. Employees must agree to abide by this policy. **Ex. A, Employee Handbook 1.1, at 1**; **Ex. A, Employee Handbook Acknowledgement of Receipt and Review, at 30**.

29. The policy begins: "The Herzog Foundation's mission is to support Christ-centered, non-denominational, Protestant Christian schools." **Ex. A, Employee Handbook 2.0, at 2**.

30. The policy also outlines the Herzog Foundation's Statement of Faith, which espouses the "central tenets of the Christian faith," to further its mission. **Ex. A, Employee Handbook 2.0, at 2**. The Statement of Faith (or "the Statement") says:

> We believe there is one God, eternally existent in three persons (Father, Son, and Holy Spirit).
>
> We believe that God the Father is the creator of heaven and earth.
>
> We believe in both the deity and incarnation of the person Jesus Christ, His virgin birth, His sinless life, His atoning death by crucifixion, His resurrection, His ascension into heaven, His eventual personal return in power and glory, and His role in the ultimate judgment of the living and the dead.
>
> We believe that humans are made in God's image, each created with a unique design and eternal soul, but are sinful and in need of redemption.
>
> We believe that humans are justified before God based solely on the atoning death of Christ, which is a gift of God's grace, not an act of works or achievement.
>
> We believe in the spiritual unity of believers in Jesus Christ.
>
> We believe that through God's strength and his Holy Spirit we are empowered to live a godly life, in conformity with God's precepts.
>
> We believe that the Bible is the inspired, infallible, and authoritative Word of God. . . .
>
> **We believe that God creates human life in the womb, and that abortion is the unjustified taking of innocent human life.**
>
> We believe that marriage is the uniting of one man and one woman in a single, exclusive union, as delineated in Scripture.
>
> We believe that God intends sexual intimacy to occur only between a man and a woman who are married to each other.
>
> We believe that God has gifted each person with a gender of either male or female, which means that rejection of one's biological sex, medical/surgical alteration of one's physical sex, and expressing oneself as the opposite gender (e.g., through transsexualism and transgenderism) is contrary to God's design.
>
> We believe that certain cultural movements have the tendency to undermine our Christian values and therefore carefully evaluate contemporary trends against the teachings of the Bible.

*Id*. **at 2-3** (emphasis added).

31.     The Herzog Foundation "considers it important to remain focused on such beliefs" espoused in its Statement of Faith. **Ex. A, Employee Handbook 2.0, at 2**. It acknowledges that it may diverge from culture on these issues, but nonetheless these views, including its view about the sanctity of life and abortion are "key moral issues" foundational to the Herzog Foundation's mission. ***Id.* at 2**.

32.     Because this Statement of Faith is so central to the Herzog Foundation's mission, employees must profess and abide by the Statement of Faith, which includes believing in and acting to preserve the sanctity of life from the womb. ***Id.* at 3** ("In order to preserve its mission, to act with integrity, and to best serve its constituency, the Foundation requires that its board members and employees share the beliefs of, and act in accordance with, this Statement.").

33.     In fact, "[e]mployees are required to certify *annually* in writing that they continue to share the beliefs of, and agree to act in accordance with, the Statement," including its position on the sanctity of life and abortion. ***Id.*** (emphasis added).

34.     Employee actions in accordance with the Statement are "conduct expectations" during an employee's tenure with the Foundation. ***Id.***

35.     Furthermore, as part of its Christian belief system, the Foundation has unique policies for handling personnel issues when employees breach the agreement to abide by and conduct themselves in accordance with the Statement of Faith. The Foundation adheres to "the biblical principles of repentance, acceptance of responsibility, and forgiveness, which may act as mitigating factors in evaluating deviations from the Foundation's conduct expectations." ***Id.***

36.     The Foundation also has its own policy for resolving disputes between the Foundation and employees "[a]s members of the Christian faith" who "believe that the Bible commands them to make every effort to live at peace and to resolve disputes with each other in

8

private or within the Christian community in conformity with the biblical injunctions of Matthew 5:23-24, Matthew 18:15-20, Romans 12:18, 1 Corinthians 6:1-8, and Hebrews 12:14-15." **Ex. A, Employee Handbook 6.9, at 19**. This policy "aligns with the Christ-centered mission of the Foundation." *Id.* "Consistent with such beliefs and goals, the Foundation and all employees enter into a Mutual Agreement to Arbitrate Claims, which provides for Christian resolution to any legal disputes that arise between the Foundation and the employee." *Id.*

37.     The Foundation and employees agree to a separate Mutual Agreement to Arbitrate Claims. **Ex. B, Arbitration Agreement**. It echoes the language of the Handbook. *Id.* **at 1** ("As members of the Christian faith, the Foundation and Employee believe that the Bible commands them to make every effort to live at peace and to resolve disputes with each other in private or within the Christian community in conformity with the biblical injunctions of Matthew 5:23-24, Matthew 18:15-20, Romans 12:18, 1 Corinthians 6:1-8, and Hebrews 12:14-15. This aligns with the Christ-centered mission of the Foundation, which both the Foundation and Employee seek to further. This Agreement serves such beliefs and goals.").

38.     All employees must agree to arbitrate any and all claims "arising out of, related to, or connected with" the employment relationship, including claims under or relating to federal law, requests for accommodations, and adverse employment actions. **Ex. B, Arbitration Agreement, at 1**.

39.     The Foundation and employees agree to arbitrate claims before an arbitrator who is a "professing protestant Christian," and they agree to arbitrate those claims in accordance with either the Institute for Christian Conciliation's Rules of Procedure for Christian Conciliation or the Crossroads Resolution Group's Rules of Procedure for Christian Conciliation, absent a separate agreement. **Ex. B, Arbitration Agreement, at 2-3**.

40.     The Employee Handbook also provides that "[v]iolation of the policies and procedures set forth in the Handbook," including failure to comply with the Handbook's conduct expectations regarding the sanctity of life and abortion, amount to "misconduct in the workplace," which "could result in discipline, up to and including immediate termination of employment." **Ex. A, Employee Handbook 5.5, at 13**. It also explicitly provides that "the conduct requirements described in the section above [section 2.0] entitled *The Foundation's Christian Beliefs, Values, and Conduct Expectations*" proscribe standards of conduct in the workplace. ***Id.* at 14**.

41.     Employees serve on an "at-will" basis, meaning that employees or the Foundation may end the employment relationship "at any time, with or without notice and with or without cause." **Ex. A, Employee Handbook 1.2, at 1**.

42.     The Foundation has a policy for use of personal social media and notes that "the following types of social media postings may result in disciplinary action (up to and including termination): . . . activity that adversely affects the Foundation's mission . . . and activity that demonstrates a violation of, or lack of alignment with, the Herzog Foundation Statement of Faith, Statement of Christian Values, and Expectations of Its Employees." **Ex. A, Employee Handbook 6.5, at 16**.

43.     The Foundation is committed to creating an environment of equal employment opportunity. **Ex. A, Employee Handbook 3.3, at 4**. The Foundation "complies with all applicable laws pertaining to nondiscrimination on the basis of race, color, national origin, biological sex, age, disability, and any other applicable legally protected category." ***Id.***

44.     The Foundation has strict policies prohibiting discrimination, workplace harassment, sexual harassment, and other harassment, including on the basis of "age, race, color, national origin, ancestry, biological sex, **pregnancy (including childbirth, lactation, and related**

10

**medical conditions**), physical or mental disability, genetic information (including testing and characteristics), veteran status, uniformed servicemember status, or any other status protected by federal, state, or local laws, **as modified by the legal exemptions for religious employers**." **Ex. A, Employee Handbook 3.3, at 4-6** (emphasis added). The policies also contain detailed procedures to deal with violations of these policies and protect whistleblowers from retaliation. ***Id.* at 4-7**.

     45.    These policies clarify that "[a]s a religious foundation, the Foundation has the right to, and does, require that its applicants and employees hold Christian beliefs consistent with, and act in accordance with, the Herzog Foundation Statement of Faith, Statement of Christian Values, and Expectations of Its Employees ('the Statement')." **Ex. A, Employee Handbook 3.3, at 4**.

     46.    The policies also state that "[g]iven the Foundation's status as a Christian organization, it does not constitute unlawful harassment for the Foundation or its leaders to espouse or communicate beliefs or values consistent with the Statement, or to communicate rejection of beliefs or values contrary to the Statement." **Ex. A, Employee Handbook 3.3, at 5**; *id*. **at 6** ("However, as stated above, given the Foundation's status as a Christian organization, it does not constitute unlawful harassment for the Foundation or its leaders to espouse or communicate beliefs or values consistent with the Statement or reject those contrary to the Statement.").

     47.    The Foundation also has robust policies providing accommodations to pregnant and nursing mothers. **Ex. A, Employee Handbook 4.10, at 10** ("Accommodations for Nursing Mothers"); **Ex. A, Employee Handbook 7.11, at 23** ("Leave Policy: Paid Leave for Childbirth and Adoption").

     48.    In accordance with its Christian mission and beliefs, the Foundation states in its Handbook: "The Foundation places a high value on families and views children as a gift from God.

The Foundation further embraces Biblical teaching regarding the special role mothers play in childbirth, nursing, nurturing, and rearing children. Based on these principles, the Foundation provides enhanced benefits to mothers with respect to childbirth and adoption." **Ex. A, Employee Handbook 7.11, at 23**.

49. Employees must sign the Employee Handbook, thereby agreeing to comply with the Handbook and all policies therein and expressing that they "understand that violation of policies in the Handbook may result in discipline, up to and including termination of employment." **Ex. A, Employee Handbook Acknowledgement of Receipt and Review, at 30**.

50. In accordance with these religious beliefs, the Foundation does not make accommodations for employees to engage in the violation of Christian moral teachings of the Foundation, including respect for human life in the womb. **Ex. C, Affidavit of Kristen Ansley.**

51. The Foundation does not and will not provide any workplace accommodation for an employee to obtain an abortion. Obtaining an abortion is grounds for adverse employment action, up to and including termination. ***Id.***

52. The Foundation will take appropriate, adverse employment action against any employee who obtains an abortion, who encourages another person to obtain an abortion, or who requests an accommodation for an abortion. ***Id.***

53. The Foundation does not and will not permit its employees to advocate in favor of abortion or abortion accommodations in the workplace or outside of it. ***Id.***

54. The Foundation will take appropriate adverse employment action against any applicant, employee, or former employee whose speech, advocacy, or conduct undermines the Foundation's teachings about abortion or to the Foundation's policies with respect to abortion. ***Id.***

## II.    The U.S. Supreme Court issues *Dobbs*, and States respond.

55.    On June 24, 2022, the U.S. Supreme Court handed down *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

56.    In that landmark case, the Supreme Court overturned *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992), and held that there is no constitutional right to obtain an abortion. *Dobbs*, 597 U.S. at 231, 240-41.

57.    The Supreme Court acknowledged that abortion presents a "question of profound moral and social importance." *Id*. at 269; *see also id*. at 223 ("Abortion presents a profound moral issue on which Americans hold sharply conflicting views."); *id*. at 257 (noting abortion poses a "critical moral question" and is "inherently different" and "unique" (quotation omitted)); *id*. at 258 ("Abortion is nothing new. It has been addressed by lawmakers for centuries, and the fundamental moral question that it poses is ageless."); *id*. at 269 (deeming abortion "an issue that has inflamed our national politics in general" (quoting *Casey*, 505 U.S. at 995-96 (opinion of Scalia, J.))); *id*. at 292 (calling "the issue of abortion" a "rancorous national controversy" and an ongoing "debate").

58.    The Court went on to say that such a contentious issue of policy belongs in the hands of the people's *elected representatives*, particularly the States, and the democratic lawmaking process. *Id*. at 232 ("It is time to heed the Constitution and return the issue of abortion to the people's elected representatives. 'The permissibility of abortion, and the limitations, upon it, are to be resolved like most important questions in our democracy: by citizens trying to persuade one another and then voting.' *Casey*, 505 U.S. at 979 (Scalia, J., concurring in judgment in part and dissenting in part). That is what the Constitution and the rule of law demand."); *id*. at 256 ("[T]he people of the various States may evaluate those interests differently. In some States, voters may believe that the abortion right should be even more extensive than the right that *Roe* and *Casey*

recognized. Voters in other States may wish to impose tight restrictions based on their belief that abortion destroys an 'unborn human being.' Miss. Code Ann. § 41–41–191(4)(b). Our Nation's historical understanding of ordered liberty does not prevent the people's elected representatives from deciding how abortion should be regulated."); *id*. at 259 ("Both sides make important policy arguments, but supporters of *Roe* and *Casey* must show that this Court has the authority to weigh those arguments and decide how abortion may be regulated in the States. They have failed to make that showing, and we thus return the power to weigh those arguments to the people and their elected representatives."); *id*. at 292 ("*Roe* and *Casey* must be overruled, and the authority to regulate abortion must be returned to the people and their elected representatives."); *id*. at 302 ("The Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion. *Roe* and *Casey* arrogated that authority. We now overrule those decisions and return that authority to the people and their elected representatives.").[1]

---

[1] Justice Kavanaugh's concurrence espoused the same ideas. *Dobbs*, 597 U.S. at 338 (Kavanaugh, J., concurring) ("The Constitution is neutral and leaves the issue for the people and their elected representatives to resolve through the democratic process in the States or Congress—like the numerous other difficult questions of American social and economic policy that the Constitution does not address."); *id*. at 338 (Kavanaugh, J., concurring) ("The nine unelected Members of this Court do not possess the constitutional authority to override the democratic process and to decree either a pro-life or a pro-choice abortion policy for all 330 million people in the United States."); *id*. at 339 (Kavanaugh, J., concurring) ("On the contrary, the Court's decision properly leaves the question of abortion for the people and their elected representatives in the democratic process. Through that democratic process, the people and their representatives may decide to allow or limit abortion."); *id*. at 341 (Kavanaugh, J., concurring) ("In sum, the Constitution is neutral on the issue of abortion and allows the people and their elected representatives to address the issue through the democratic process."); *id*. at 346 (Kavanaugh, J., concurring) ("Instead, those difficult moral and policy questions will be decided, as the Constitution dictates, by the people and their elected representatives through the constitutional processes of democratic self-government."); *id*. at 347 (Kavanaugh, J., concurring) ("The Court today properly heeds the constitutional principle of judicial neutrality and returns the issue of abortion to the people and their elected representatives in the democratic process.").

14

59.     Now "the States may regulate abortion for legitimate reasons," and "courts cannot 'substitute their social and economic beliefs for the judgment of legislative bodies.'" *Id.* at 300 (citation omitted).

60.     The States immediately responded. Within the hour that the Supreme Court handed down *Dobbs*, Missouri became the first State in the country to ban abortion.

61.     On June 24, 2022, Missouri Governor Mike Parson and then-Attorney General Eric Schmitt signed proclamations banning abortion except in the case of medical emergencies and activating the "Right to Life of the Unborn Child Act," § 188.017, RSMo. That ban remains in effect.

62.     Some States joined Missouri in outlawing abortion. *See, e.g.*, 2022 Ky. Acts ch. 210, § 31; Abortion, 2022 La. Sess. Law Serv. Act 545 (S.B. 342) (West); Abortion, 2022 Okla. Sess. Law Serv. Ch. 11 (S.B. 612) (West); 2022 West Virginia Laws 3rd Ex. Sess. Ch. 1 (H.B. 302); Alabama Human Life Protection Act, 2019 Alabama Laws Act 2019-189 (H.B. 314); Human Life Protection Act, 2019 Arkansas Laws Act 180 (S.B. 149); Living Infants Fairness And Equality (Life) Act, 2019 Georgia Laws Act 234 (H.B. 481).[2]

63.     Other States enacted laws permitting and expanding access to abortion. *See, e.g.*, 2022 Cal. Legis. Serv. Ch. 738 (A.B. 204) (West); 2022 Cal. Legis. Serv. Prop. 1 (Proposition 1) (West); 2022 Conn. Legis. Serv. P.A. 22-19 (S.B. 5414) (West); 2022 Delaware Laws Ch. 327 (H.B. 455); Abortion Care Access Act, 2022 Maryland Laws Ch. 56 (H.B. 937); 2022 Mich. Legis.

---

[2] States continued to pass legislation restricting abortion well after the passage of the PWFA. 2023 Idaho Laws Ch. 298 (H.B. 374) 2023; 2023 North Dakota Laws Ch. 122 (S.B. 2150); 2023 South Carolina Laws Act 70 (S.474); 2023 Tennessee Laws Pub. Ch. 313 (H.B. 883); 2023 Wyoming Laws Ch. 184 (H.B. 152).

Serv. Ref. Meas. 22-3 (Proposal 22-3) (West); 2022 Wash. Legis. Serv. Ch. 65 (H.B. 1851) (West); 2021 NJ Sess. Law Serv. Ch. 375 (Senate 49) (West).[3]

64.    Still other States' laws permitted abortion before, but outlawed abortion after a certain gestational age. *See, e.g.*, 2022 Fla. Sess. Law Serv. Ch. 2022-69 (H.B. 5) (West) (prohibiting abortion after 15 weeks gestational age); 2022 Ind. Legis. Serv. 1st Sp. Sess. P.L. 179-2022(ss) (S.E.A. 1) (ss) (West) (prohibiting abortion after 20 weeks gestation and prohibiting insurance coverage of unlawful abortions); 2022 New Hampshire Laws Ch. 119 (H.B. 1609) (prohibiting abortion after 24 weeks).[4]

65.    On the accommodation issue, some States that outlawed abortion in whole or in part still had laws requiring accommodations for pregnant workers before the PWFA was enacted but did not provide accommodations to state employees to obtain elective abortions in violation of state law.

66.    Congress proposed various laws regarding abortion, which *explicitly* mentioned abortion. *See, e.g.*, No Federal Funds for Abortion Travel Expenses Act of 2022, H.R. 8776, 117th Cong. (2022); Preventing Abortion Sanctuaries Act, H.R. 8501, 117th Cong. (2022); Protecting Life from Chemical Abortions Act, H.R. 9657, 117th Cong. (2022); Protecting Pain-Capable

---

[3] States also continued to pass legislation permitting and expanding abortion access well after passage of the PWFA. Ohio Constitution, Article I, Section 22 (2023 Reference Issue 1 Referendum); 2023 Hawaii Laws Act 2 (S.B. 1); 2023 Me. Legis. Serv. Ch. 352 (H.P. 857) (L.D. 1343) (West); 2023 Me. Legis. Serv. Ch. 416 (H.P. 1044) (L.D. 1619) (West); 2023 Minn. Sess. Law Serv. Ch. 70 (S.F. 2995) (West); 2023 Sess. Law News of N.Y. Ch. 129 (A. 1395-C) (West); 2023 Oregon Laws Ch. 228 (H.B. 2002); 2023 Vermont Laws No. 15 (S. 37) (mandating insurance coverage for abortion).

[4] States continued to pass legislation prohibiting abortion after a certain gestational age into 2024. *See, e.g.*, 2024 Ariz. Legis. Serv. Ch. 181 (H.B. 2677) (West) (prohibiting abortion after 15 weeks); 2023 Fla. Sess. Law Serv. Ch. 2023-21 (S.B. 300) (West) (prohibiting abortion after 6 weeks); 2023 Nebraska Laws L.B. 574 (prohibiting abortion after 12 weeks); 2023 North Carolina Laws S.L. 2023-14 (S.B. 20) (prohibiting abortion after 12 weeks); Victim Services Amendments, 2023 Utah Laws Ch. 158 (H.B. 297) (prohibiting abortion after 18 weeks).

Unborn Children from Late-Term Abortions Act, H.R. 8814, 117th Cong. (2022); Protecting Pain-Capable Unborn Children from Late-Term Abortions Ac, S. 4840, 117th Cong. (2022);  Providing for Life Act of 2023, H. R. 8851, 117th Cong. (2022); Providing for Life Act of 2023, S. 4868, 117th Cong. (2022); Reproductive Freedom for All Act, S.4688, 117th Cong. (2022); Standing with Moms Act, H. R. 8384, 117th Cong. (2022); Standing with Mom's Act, S. 4541, 117th Cong. (2022); Women's Health Protection Act, H.R. 8296, 117th Cong. (2022).

67.     Within those first few months after *Dobbs*, the country was deeply fractured on this issue, largely along partisan lines.

68.     In that climate, six months after the Supreme Court handed down *Dobbs*, Congress enacted the Pregnancy Workers Fairness Act, 42 U.S.C. § 2000gg.

### III.     Congress enacts the Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg.

69.     In December 2022, less than six months after the Supreme Court issued *Dobbs*, Congress passed the Pregnancy Workers Fairness Act to fill a gap unaddressed by federal law.

70.     Title VII of the Civil Rights Act prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or national origin." 42 U.S.C. § 2000e–2(a)(1) (emphasis added). As enacted, the statute did not prohibit discrimination on account of pregnancy. *See generally Gen. Elec. Co. v. Gilbert,* 429 U.S. 125 (1976).

71.     To protect pregnant women from discriminatory employment practices, Congress passed the Pregnancy Discrimination Act ("PDA"), which updated the definitions of "because of sex" and "on the basis of sex" in Title VII of the Civil Rights Act to include "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). The PDA did not require employers to make any accommodations for pregnant women in the workforce.

17

72.     Title VII *negatively prohibits* employers from taking discriminatory action, but it does not *affirmatively require* employers to provide additional accommodations.

73.     In 1990, Congress passed the Americans with Disabilities Act ("ADA") which required employers to make reasonable accommodations for workers with disabilities. 42 U.S.C. § 12112(b)(5)(A). The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). However, lower courts have found that "[p]regnancy per se is not a disability" except when dealing with "the magnitude of symptoms experienced by the mother, outside typical pregnancy complications." *Walker v. Fred Nesbit Distrib. Co.*, 331 F. Supp. 2d 780, 790 (S.D. Iowa 2004); *see also Gover v. Speedway Super Am.*, LLC, 254 F. Supp. 2d 695, 705 (S.D. Ohio 2002) (collecting cases).

74.     Thus, while Title VII protects pregnant women from discriminatory employment practices and the ADA requires reasonable accommodations for permanent conditions caused by unusual pregnancy complications, pregnant woman in the workforce possessed no means in federal law by which to request reasonable accommodations for the numerous limitations brought on by an ordinary pregnancy.

75.     Congress "closely modeled" the PWFA after the ADA to "require employers to make reasonable accommodations to allow pregnant workers to continue working safely." Senator Bob Casey, *Casey, Cassidy Introduce Bipartisan Pregnant Workers Fairness Act, Propose Protections Against Workplace Discrimination* (Apr. 29, 2021), https://www.casey.senate.gov/news/releases/casey-cassidy-introduce-bipartisan-pregnant-workers-fairness-act-propose-protections-against-workplace-discrimination [hereinafter Casey Press Release].

18

76. In doing so, Congress sought to apply the ADA's accommodation requirements to "known limitations" experienced by pregnant and postpartum women that did not reach the ADA's disability threshold.

77. And in doing so, the PWFA adopted "the same process that individuals with disabilities use under the Americans with Disabilities Act" for pregnant employees to "request reasonable accommodations from their employer." 168 Cong. Rec. § 10081 (daily ed. Dec. 22, 2022) (statement of Sen. Bob Casey).

78. As PWFA co-sponsor Senator Bob Casey (D-PA) stated, the PWFA "closes a loophole in the 1978 Pregnancy Discrimination Act to allow pregnant workers to request reasonable accommodations so that they can continue working safely during pregnancy and upon returning to work after childbirth." *Id.*

79. Congress's goal behind the PWFA was simple. As bill co-sponsor Senator Lisa Murkowski (R-AK) said, the PWFA was intended to ensure that women received "the basic, commonsense accommodations they need at work to ensure a healthy pregnancy and a healthy baby." *Supra*, Casey Press Release.

80. In doing so, the PWFA effectuated its goal to "support women's health and the health of their babies." *Id.*; *see also* Comment from Sen. Cassidy at 1 (Sept. 29, 2023), https://www.help.senate.gov/imo/media/doc/pwfa_comment_letter.pdf [hereinafter "Sen. Cassidy Comment"].

81. In the words of bill co-sponsor Senator Patty Murray (D-WA) on the Senate floor, the PWFA was enacted because "no one should have to choose between their job and a healthy pregnancy." 168 Cong. Rec. § 7049 (daily ed. Dec. 8, 2022) (statement of Sen. Patty Murray). The PWFA addressed the simple problem that "people who are looking forward to welcoming a new

family member are having their lives upturned or losing the paychecks they depend on to make rent or buy groceries or pay for childcare, all because their employers refuse to provide basic, commonsense, low-cost and even no-cost accommodations." *Id*.

82.     Senator Murray noted that she could not "think of a more commonsense, less controversial bill." *Id*.

83.     Bill co-sponsor Senator Casey (D-PA) likewise stated that the goal was to aid "women in the workforce who are entering motherhood." *Supra*, Casey Press Release. In his words, the PWFA promoted "commonsense changes" such as providing pregnant women with "additional bathroom breaks, light duty or a stool to sit on if a worker stands all day." *Id*.

84.     Senator Casey also stated on the Senate floor: "I want to say for the record, however, that under the act, under the Pregnant Workers Fairness Act, the Equal Opportunity Employment Commission [sic], the EEOC, could not—could not—issue any regulation that requires abortion leave, nor does the act permit the EEOC to require employers to provide abortions in violation of State law." 168 Cong. Rec. § 7050 (daily ed. Dec. 8, 2022) (statement of Sen. Bob Casey).

85.     Bill co-sponsor Senator Bill Cassidy (R-LA), likewise stated on the Senate floor: "I reject the characterization that this would do anything to promote abortion." 168 Cong. Rec. § 7050 (daily ed. Dec. 8, 2022) (statement of Sen. Bill Cassidy).

86.     Senator Cassidy then read a statement from the U.S. Conference of Catholic Bishops, a pro-life religious group who supported the PWFA on the grounds that it was a pro-life statute but later successfully challenged the EEOC's abortion accommodation mandate in *Louisiana v. EEOC*, 705 F. Supp. 3d 643 (W.D. La. 2024). The statement said:

> We believe that [this] version of the bill, read in light of existing liberty protections, helps advance the [U.S. Conference of Catholic Bishops'] goal of ensuring that no

woman ever feels forced to choose between her future and the life of her child while protecting the conscience rights and religious freedoms of employers.

168 Cong. Rec. § 7050 (daily ed. Dec. 8, 2022) (statement of Sen. Bill Cassidy).

87. Senator Cassidy further stated that the PWFA promoted the "pro-life position" because its intention was "to make an accommodation for that woman who has those needs [for an accommodation] so she can safely carry the baby to term." *Id*.

88. Senator Cassidy also told his colleagues in his remarks that other "pro-life" groups, such as "March of Dimes, who are so vitally concerned about the health of children, likewise support[] [the PWFA]." *Id*.

89. Senator Cassidy also noted that the PWFA had a robust religious exemption and ministerial exception:

> Is it possible that this law would permit someone to impose their will upon a pastor, upon a church, upon a synagogue, if they have religious exemptions? The answer is, absolutely no. This is what the U.S. Conference of Catholic Bishops was referring to. The title VII exemption, which is in Federal law, remains in place. It allows employers to make employment decisions based on firmly held religious beliefs. This bill does not change this. There is an exemption in title VI related to pastors and ministers and Rabbis who conduct their business. All of that remains in place, which is why the U.S. Conference of Catholic Bishops last night once again endorsed the bill.

*Id*.

90. Senator Cassidy summarized the purpose of the PWFA to ensure "a safe environment for pregnant women and their unborn children in the workplace. They deserve our attention. I would say that this bill is pro-family, pro-mother, pro-baby, pro-employer, and pro-economy." *Id*.

91. Senator Steve Daines (R-MT) similarly stated:

> Mr. President, the purpose of the Pregnant Workers Fairness Act is to help pregnant mothers in the workplace receive accommodations so that they can maintain a healthy pregnancy and childbirth. Therefore, I want to make clear for the record that the terms "pregnancy" and "related medical conditions," for which

21

accommodations to their known limitations are required under the legislation, do not include abortion.

On December 8, the sponsor of this legislation, Senator Bob Casey stated on the Senate floor as follows: "I want to say for the record, however, that under the act, under the Pregnant Workers Fairness Act, the Equal Opportunity Employment Commission, the EEOC, could not--could not--issue any regulation that requires abortion leave, nor does the act permit the EEOC to require employers to provide abortions in violation of State law."

Senator Casey's statement reflects the intent of Congress in advancing the Pregnant Workers Fairness Act today. This legislation should not be misconstrued by the EEOC or Federal courts to impose abortion-related mandates on employers, or otherwise to promote abortions, contrary to the intent of Congress.

168 Cong. Rec. § 10081 (daily ed. Dec. 22, 2022) (statement of Sen. Steve Daines).

92.    The PWFA received widespread bipartisan support.

93.    The U.S. House of Representatives voted to pass the PWFA into law on May 14, 2021, by a vote of 315 yeas and 101 nays. *Roll Call 143, Bill Number: H.R. 1065,* Office of the Clerk, U.S. House of Representatives (May 14, 2021), https://clerk.house.gov/Votes/2021143.

94.    The Senate voted to pass the PWFA into law on December 22, 2022, less than six months after *Dobbs*, by a vote of 73 yeas and 24 nays. *Roll Call Vote 117th Congress - 2nd Session*, U.S.              Senate              (Dec.              22,              2022), https://www.senate.gov/legislative/LIS/roll_call_votes/vote1172/vote_117_2_00416.htm.

95.    President Biden signed the bill into law on December 29, 2022. Consolidated Appropriations Act, 2023, Public Law 117–328, Division II, 136 Stat. 4459, 6084 (2022) (codified at 42 U.S.C. §§ 2000gg-2000gg–6).

96.    As enacted, the PWFA regulates "covered entit[ies]," which includes private employers with 15 or more employees in industries affecting commerce. 42 U.S.C. §§ 2000gg(2), 2000e.

97.    Covered entities violate the PWFA should they

(1) not make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity;

(2) require a qualified employee affected by pregnancy, childbirth, or related medical conditions to accept an accommodation other than any reasonable accommodation arrived at through the interactive process referred to in section 2000gg(7) of this title;

(3) deny employment opportunities to a qualified employee if such denial is based on the need of the covered entity to make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of the qualified employee;

(4) require a qualified employee to take leave, whether paid or unpaid, if another reasonable accommodation can be provided to the known limitations related to the pregnancy, childbirth, or related medical conditions of the qualified employee; or

(5) take adverse action in terms, conditions, or privileges of employment against a qualified employee on account of the employee requesting or using a reasonable accommodation to the known limitations related to the pregnancy, childbirth, or related medical conditions of the employee.

*Id*. § 2000gg–1.

98.     The PWFA defines "known limitation" as a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." *Id*. § 2000gg(4).

99.     The PWFA also prohibits retaliation, discrimination against an employee because the employee "opposed any act or practice made unlawful by this chapter or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter," and coercion directed toward an employee "in the exercise or enjoyment of, or on account of such individual having exercised or enjoyed, or on account of such individual having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." *Id*. § 2000gg–2(f).

100.     The PWFA does not further define what constitutes "pregnancy, childbirth, or related medical conditions."

23

101.    The PWFA never mentions abortion.

102.    The PWFA fully incorporates Title VII's exemption for religious employers, *id*. § 2000gg–5(b) (stating the PWFA "is subject to the applicability to religious employment set forth in section 2000e–1(a) of this title"), which provides an exemption for "a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities," *id*. § 2000e–1(a).

103.    Title VII broadly defines "religion" to include "all aspects of religious observance and practice, as well as belief." *Id*. § 2000gg–5(b)

104.    The PWFA incorporates Title VII's enforcement provisions and empowers the EEOC to enforce the statute, *id*. § 2000gg–2(a) (citing *id*. § 2000e–4 *et seq*.), thereby empowering the EEOC "to prevent any person from engaging in any unlawful employment practice," *id*. § 2000e–5(a).

105.    The EEOC can bring enforcement actions against private employers or authorize private individuals to bring suits for damages, injunctive relief, and attorneys' fees for violations of the PWFA. *Id*. §§ 2000gg–2(a), 2000e–5; *id*. § 1981a.

106.    The PWFA gave the EEOC authority to issue regulations that "shall provide examples of reasonable accommodations addressing known limitations related to pregnancy, childbirth, or related medical conditions." *Id*. § 2000gg–3(1).

**IV.    The EEOC issues a Final Rule with an abortion accommodation mandate.**

107.    The EEOC issued a notice of proposed rulemaking under the PWFA on August 11, 2023.

24

108.    Despite the silence of the PWFA on the topic of abortion, the proposed rule stated that "having . . . an abortion" qualifies as a "pregnancy, childbirth, or related medical condition[]" and thereby triggers the requirement for employers to provide reasonable accommodations for employees to obtain an abortion (otherwise known as the "abortion accommodation mandate"). *Regulations to Implement the Pregnant Workers Fairness Act*, 88 Fed. Reg. 54,714, 54,721 (Aug. 11, 2023) (Proposed Rule).

109.    The EEOC received over 94,000 comments in response. *See Implementation of the Pregnant Workers Fairness Act*, 89 Fed. Reg. 29,096 (Apr. 19, 2024). The majority—54,000 comments—advocated against the abortion accommodation mandate; only 40,000 comments advocated in favor of the abortion accommodation mandate. *Id*. at 29,104.

110.    Among the 54,000 comments against the mandate was one from the Herzog Foundation. On October 10, 2023, the Herzog Foundation filed a comment in opposition to the proposed rule because the rule imposed an abortion accommodation mandate and did not specify whether the ministerial exception would bar claims. **Ex. D, Comment by the Stanley M. Herzog Foundation**.

111.    Among those comments advocating against the abortion accommodation mandate was one from Senator Bill Cassidy, a co-sponsor of the PWFA. He rebuked the EEOC for "ignor[ing] the statute and substitut[ing] its views on abortion for those of Congress." *Supra*, Sen. Cassidy Comment, at 1. He went on to say: "I am gravely concerned by the Commission's decision to inject abortion politics into the definition of 'pregnancy, childbirth, or related medical conditions,' rather than implement the Act consistent with the bipartisan goal to provide reasonable accommodations to pregnant and postpartum workers." *Id*. (footnoted omitted).

25

112.     The EEOC acknowledged the 54,000 comments in opposition and noted that "[m]any of the comments urging the Commission to exclude abortion from the definition of 'pregnancy, childbirth, or related medical conditions' expressed the view that abortion is the destruction of a human life, that it is objectionable for moral or religious reasons, and that it is not health care." 89 Fed. Reg. at 29,104. The EEOC went on to "recognize[] these are sincere, deeply held convictions and are often part of an individual's religious beliefs." *Id*.

113.     The EEOC nevertheless dismissed those concerns.

114.     On April 3, 2024, only three of the five unelected EEOC commissioners voted to pass the "Final Rule and Interpretive Guidance to Implement the Pregnant Workers Fairness Act (PWFA)." U.S. Equal Emp. Opp. Comm'n, *Commission Votes: April 2024* (April 3, 2024), https://www.eeoc.gov/commission-votes-april-2024.

115.     Unlike the overwhelming super-majority bipartisan support for the PWFA in Congress, the Final Rule passed by a one vote margin, and the 3-2 vote split along partisan lines.

116.     Commissioners Charlotte Burrows, Jocelyn Samuels, and Kalpana Kotagal voted in favor. U.S. Equal Emp. Opp. Comm'n, *Commission Votes: April 2024* (April 3, 2024), https://www.eeoc.gov/commission-votes-april-2024.

117.     Commissioners Andrea Lucas and Keith Sonderling dissented. *Id*.; **Ex. E, Dissent of Commissioner Andrea R. Lucas**.

118.     In her dissent, Commissioner Lucas noted that the ordinary meaning canon was sufficient to bar the EEOC's interpretation of "pregnancy, childbirth, and related medical conditions" to include abortion. **Ex. E, Dissent of Commissioner Andrea R. Lucas, at 9-11**. In her view, the EEOC's failure to grapple with the unambiguous text first violated "the paramount

and 'fundamental rule' of statutory interpretation." ***Id.* at 9** (quoting and citing ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 56-8, 69 (2012)).

119.     The EEOC published the Final Rule and Interpretive Guidance on April 19, 2024. It went into effect on June 18, 2024.

120.     The Final Rule is codified at 29 C.F.R. § 1636 *et seq*.

121.     The Final Rule provides that a "related medical condition[]" to "pregnancy" or "childbirth" in the PWFA is the voluntary choice to obtain an "abortion." 29 C.F.R. § 1636.3(b). The Final Rule thereby mandates employers to provide reasonable accommodations to women who obtain abortions—and any other procedures that may fall within the "non-exhaustive" list of potential "related medical conditions." *Id.*

122.     The Final Rule creates multiple secular exemptions.

123.     For example, employers with fewer than 15 employees do not have to comply. 29 C.F.R. § 1636.2(b)(1). Employers who face a capaciously defined "undue hardship"—*i.e.* "a significant difficulty or expense" with several non-dispositive factors to consider in making that determination—do not have to provide accommodations. *Id.* §§ 1636.3(j)(1)-(2), 1636.3(h)(1)(63).

124.     The Final Rule acknowledges "Congress' lack of an explicit mention of abortion in the PWFA." 89 Fed. Reg. at 29,111.

125.     Yet nonetheless, the EEOC's thin, one-vote majority interprets Congress' complete silence on the topic of abortion as evidence of Congress' intent for abortion to trigger mandatory pregnancy-related accommodations. *Id.*

126.     Section 1636.7(b) admits that the PWFA fully incorporates Title VII's exemption for religious corporations, associations, educational institutions, and societies. 29 C.F.R.

§ 1636.7(b). However, the EEOC's rule narrows the scope and application of the Title VII exemption, providing that "the Commission will consider the application of the provision on a case-by-case basis," and that such exemptions are only available to a "respondent employer" as "defenses asserted in response to a charge." *Id*. § 1636.7(b) ¶ 22 & n.206.

127.     In other words, the regulation does not provide any means for religious employers to secure their statutory rights to religious exemptions until *after* charges are brought against them.

128.     In response to First Amendment concerns raised by numerous religious groups, the EEOC stated, noted

> that for a RFRA defense to arise in litigation brought by the Commission under the PWFA, there would first have to be a charge of discrimination filed where the employer refused to provide an accommodation based on its religious exercise. Then, prior to filing an enforcement action in court, the Commission would have to investigate the charge, find reasonable cause, and decide to bring litigation. At any point during that administrative process, the employer could assert a RFRA defense.

89 Fed. Reg. at 29,149 n.258.

129.     Despite the sweeping, automatic nature of the PWFA's exemption for religious entities, 42 U.S.C. §§ 2000gg–5, 2000e–1(a), the EEOC stated it would only "consider the application of the provision on a case-by-case basis." 89 Fed. Reg. at 29,220.

**V.     A federal court enjoins the Final Rule as applied to two States and multiple religious organizations.**

130.     On June 17, 2024, the day before they went into effect, the United States District Court for the Western District of Louisiana preliminarily enjoined the regulations, partially blocking them from going into effect in Louisiana and Mississippi. That case involved the consolidated challenges of two Catholic dioceses in Louisiana, the United States Conference of Catholic Bishops, Catholic University—a Catholic institution of higher education, the State of

Louisiana, and the State of Mississippi. The district court determined that all parties had standing.

*Louisiana v. EEOC*, 705 F. Supp. 3d 643, 655-56 (W.D. La. 2024).

131.    In evaluating claims of religious plaintiffs-organizations, the court stated:

> Plaintiffs' credible-threat analysis is quite simple. First, they admit they are breaking EEOC guidance, which the EEOC does not seriously contest. They posit statutory and constitutional issues with the laws under which they are at risk of being prosecuted: Those issues, they allege, are already forcing plaintiffs to choose either to restrict their religious practices or to risk potential penalties. . . . [P]laintiffs, too, have a legitimate fear of prosecution, chilling their rights. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion).

*Louisiana v. EEOC*, 705 F. Supp. 3d 643, 655-56 (W.D. La. 2024) (quoting *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 926–27 (5th Cir. 2023)).

132.    The court further stated:

> [F]orcing the *Bishops* Plaintiffs to address their religious exceptions on a case-by-case basis – which, as a practical matter, would require them to wait until an EEOC investigation has opened and then retain attorneys to investigate the claim and assert individual defenses against the EEOC – presents, at a minimum, a substantial likelihood of added regulatory burden and compliance costs.

*Id*. at 656. The court then determined that plaintiffs had standing to challenge the abortion accommodation mandate of the Final Rule. *Id*.

133.    In assessing the preliminary injunction factors, the court determined that the religious plaintiffs were likely to succeed on merits of their Administrative Procedure Act ("APA") and religious challenges to the Final Rule.

134.    Beginning with the APA, the court found that the EEOC had likely exceeded its statutory authority. Based on canons of statutory interpretation, the court adopted the "presumption that Congress's decision <u>not</u> to include any reference to abortion in the PWFA was intentional." *Id*. at 658. It determined that abortion did not fit in meaning of the phrase, "pregnancy, childbirth, or related medical conditions." *Id*

29

135.    The court further determined that the major questions doctrine barred inclusion of

abortion in the statute, finding

> "Abortion" is a term that is readily understood by everyone. If Congress had
> intended to mandate that employers accommodate elective abortions under the
> PWFA, it would have spoken clearly when enacting the statute, particularly given
> the enormous social, religious, and political importance of the abortion issue in our
> nation at this time (and, indeed, over the past 50 years). The Court is therefore not
> persuaded, on the record before it, that Congress could reasonably be understood
> to have granted the EEOC the authority to interpret the scope of the PWFA in a
> way that imposes a nationwide mandate on both public and private employers –
> irrespective of applicable abortion-related state laws enacted in the wake of *Dobbs*
> – to provide workplace accommodation for the elective abortions of employees.
> In this sense, EEOC's use of its regulatory power to insert the issue of abortion into
> a law designed to ensure healthy pregnancies for America's working mothers
> squarely implicates the "major questions doctrine" as enunciated by the Supreme
> Court.

*Id*. at 658-59 (quoting *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 724 (2022)). The court

went on to apply the major questions doctrine, requiring the EEOC to "point to 'clear congressional

authorization' to extend the PWFA to impose an abortion accommodation mandate on public and

private employers." *Id*. at 659 (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324

(2014)). The court then concluded:

> Not only is the EEOC unable to point to any language in the PWFA empowering it
> to mandate the accommodation of elective abortions, but there can be little doubt
> in today's political environment that any version of the PWFA that included an
> abortion accommodation requirement would have failed to pass Congress. The
> Court therefore finds that the EEOC's arguments fail at this stage of the proceeding.

*Id*. at 659-60.

136.    The court noted that "one judicial opinion this Court *can* presume Congress was

aware of when it passed the PWFA was the *Dobbs* decision," given the PWFA's enactment just

"six months after the Supreme Court decided *Dobbs*, which removed abortion as a constitutional

concern and expressly returned the issue to the States." *Id*. at 660. From this premise the court

held: "With *Dobbs* and all of its implications fresh in the minds of lawmakers, it is not credible

that Congress clearly intended that the PWFA include an abortion accommodation mandate." *Id*.

30

137.    The court further determined, "if there were any remaining doubt, the legislative history unambiguously confirms that Congress specifically <u>did not</u> intend for the PWFA to require employers to accommodate abortion." *Id*. at 660.

138.    The court concluded that the abortion accommodation mandate likely violated the APA and stated:

> At its core, this is a textbook case of a federal administrative agency exceeding its statutory authority in a way that both usurps the role of Congress and violates authority vested in the states under the principles of federalism. Considering the foregoing, this Court finds a likelihood of success of the merits that EEOC's textual interpretation of the PWFA to include an abortion accommodation mandate exceeds that agency's Congressional authorization.

*Id*. at 660-61.

139.    The court also found the religious plaintiffs were likely to succeed on their claims asserting that the Final Rule's application of religious exceptions on a case-by-case basis constituted statutory and constitutional overreach. *Id*. at 661-63.

140.    As for the remaining preliminary injunction factors, the Western District of Louisiana found that the States and religious plaintiffs would suffer "specific and irreparable injuries if the abortion accommodation mandate is not enjoined." *Id*. at 663. The court further held that the balance of equities and public interest weighed in the plaintiffs' favor. *Id*. at 663-64.

141.    The court thereby entered a partial preliminary injunction of the Final Rule to protect those plaintiffs. *Id*. at 664.

142.    The Final Rule went into effect on June 18, 2024.

143.    Ten days later, the U.S. Supreme Court overturned *Chevron, U.S.A Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (2024), in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), and held that federal courts must independently determine whether an agency has acted within its statutory authority without deferring to the agency's interpretation.

31

**Violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb–1**

144.    The Religious Freedom Restoration Act ("RFRA") mandates that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb–1(a). The *only* exception is if the government "demonstrates that application of the burden to the person— (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb–1(b). "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." *Id.* § 2000bb–1(c).

145.    Organizations and corporations are considered "persons" under RFRA and can bring RFRA claims based on their religious beliefs. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706-08 (2014).

146.    RFRA broadly defines the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb–2(4), 2000cc–5(7)(A).

147.    Compliance with the Final Rule would substantially burden the Herzog Foundation's sincerely held religious beliefs.

148.    The Foundation is a charitable, religious nonprofit that explicitly operates under religious values protected by the First Amendment of the U.S. Constitution.

149.    As such, the Foundation qualifies as a person entitled to protection under RFRA. *Hobby Lobby*, 573 U.S. at 706-08.

150.    The Foundation holds sincere Christian beliefs that life begins at conception and abortion violates God's design and the sanctity of life.

151. In accordance with these beliefs, the Foundation requires its employees to hold the same views and to conduct themselves in accordance therewith.

152. The Foundation's advocacy for, conformance with, and expression of its beliefs constitute religious exercise.

153. The Foundation's employment policies are religious exercise.

154. It would violate and substantially burden the Foundation's sincere religious beliefs to comply with the Final Rule's abortion accommodation mandate and the EEOC's interpretation of the PWFA and Title VII to include abortion.

155. The Final Rule's mandate forces the Foundation to either violate its sincerely held religious beliefs and change its employment practices or face lawsuits and/or enforcement actions by the EEOC. Given this choice, the Foundation faces a substantial burden and irreparable harm.

156. The abortion accommodation mandate is not in furtherance of a compelling government interest nor is it the least restrictive means to achieve any such interest.

157. The EEOC does not have a compelling interest in enforcing the abortion accommodation mandate against the Foundation specifically. *See Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 430-31 (2006) ("RFRA and the strict scrutiny test it adopted . . . require the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened. . . . [The] Court look[s] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[s] the asserted harm of granting specific exemptions to particular religious claimants." (quoting 42 U.S.C. § 2000bb–1(b))).

158.    There is no constitutional right to obtain an abortion or any accommodations associated with abortion. *Dobbs*, 597 U.S. at 231.

159.    The EEOC has adopted categorical secular exemptions to the abortion accommodation mandate, such as exempting organizations with 15 employees or less.

160.    Even if the EEOC had a compelling interest, the abortion accommodation mandate is not the least restrictive means to achieve any compelling interest. *Hobby Lobby*, 573 U.S. at 728 (noting that the "least-restrictive-means standard is exceptionally demanding" (citation omitted)).

161.    Even if the EEOC sought to protect a *constitutional* right, the abortion accommodation mandate would not satisfy the least restrictive means standard. *Id*. (holding that even if the government had a compelling interest in protecting the constitutional rights of citizens to contraception, the government's action was not the least restrictive means to protect that interest).

162.    The Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, violate the Foundation's rights under RFRA.

163.    The Foundation will face irreparable and imminent harm absent a permanent and preliminary injunction.

## COUNT II

**Violation of First Amendment of the United States Constitution Free Exercise Clause**

164.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set forth herein.

165.    The First Amendment to the United States Constitution provides that Congress shall make no law prohibiting the free exercise of religion. U.S. Const. amend. I.

166.    The Free Exercise Clause of the First Amendment requires that any law that burdens religious practice must be "neutral and of general applicability" *Church of Lukumi Babalu Aye,*

34

*Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). A law is not neutral or generally applicable if the government has discretion "to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton v. City of Philadelphia*, 593 U.S. 522, 537 (2021). If a law is not neutral and of general applicability, it "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 531–32.

167.    The Foundation holds sincere Christian beliefs that life begins at conception and abortion violates God's design and the sanctity of life.

168.    In accordance with these beliefs, the Foundation requires its employees to hold the same views and to conduct themselves in accordance therewith.

169.    The Foundation's advocacy for, conformance with, and expression of its beliefs constitute religious exercise under the First Amendment.

170.    The Foundation's employment policies are religious exercise under the First Amendment.

171.    It would violate and substantially burden the Foundation's sincere religious beliefs to comply with the Final Rule's abortion accommodation mandate and the EEOC's interpretation of the PWFA and Title VII to include abortion.

172.    The Final Rule's mandate forces the Foundation to either violate its sincerely held religious beliefs and change its employment practices or face lawsuits and/or enforcement actions by the EEOC. Given this choice, the Foundation faces a substantial burden and irreparable harm.

173.    The Final Rule is not neutral and generally applicable. It gives the EEOC total discretion to make "case-by-case" decisions on whether a proposed accommodation was sufficiently "reasonable" and whether accommodating a particular employee or particular request is an "undue hardship." 89 Fed. Reg. at 29,205.

174.    The Final Rule also has categorical secular exemptions to the abortion accommodation mandate, such as exempting organizations with 15 employees or less.

175.    The burden that the Final Rule places on the Foundation's religious exercise furthers no compelling governmental interest.

176.    The burden that the Final Rule places on the Foundation's religious exercise is not the least restrictive means of furthering EEOC's interests with respect to Plaintiffs, if any exist.

177.    The Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, violate the Foundation's rights secured to them by the Free Exercise Clause of the First Amendment.

178.    The Foundation will face irreparable and imminent harm absent a permanent and preliminary injunction.

## COUNT III

**Violation of Administrative Procedure Act and Declaratory Judgment Act:
Contrary to Constitutional Right**

179.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set forth herein.

180.    Defendants are "agencies" under the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 551(1), 701(b)(1).

181.    The Final Rule is a "rule" under the APA. *Id*. §§ 551(4), 701(b)(2).

182.    The Final Rule is "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id*. § 704.

183.    The APA mandates "judicial review" of agency action where a person suffers "legal wrong because of agency action." *Id*. § 702.

36

184. The APA allows a reviewing court to "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." *Id*. § 706(2)(B).

185. For the reasons stated in COUNT II, the Final Rule is contrary to the Foundation's rights under the First Amendment to the U.S. Constitution.

186. Accordingly, the Final Rule must be set aside.

187. The Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, force the Foundation to either violate its sincerely held religious beliefs and change its employment practices or face lawsuits and/or enforcement actions by the EEOC.

188. Given this choice, the Foundation will face irreparable and imminent harm absent a permanent and preliminary injunction.

## COUNT IV

**Violation of Administrative Procedure Act and Declaratory Judgment Act:
Inclusion of Abortion in Excess of Statutory Jurisdiction**

189. Plaintiff realleges and incorporates the foregoing paragraphs as if fully set forth herein.

190. Defendants are "agencies" under the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

191. The Final Rule is a "rule" under the APA. *Id*. §§ 551(4), 701(b)(2).

192. The Final Rule is "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id*. § 704.

193. The APA mandates "judicial review" of agency action where a person suffers "legal wrong because of agency action." *Id*. § 702.

194. The APA requires a "reviewing court" to "hold unlawful and set aside agency action "in excess of statutory jurisdiction, authority, or limitation, or short of statutory right." *Id*. § 706(2)(C).

37

195.     The EEOC's only authority to "issue regulations" under the PWFA states: "Such regulations shall provide examples of reasonable accommodations addressing known limitations related to pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg–3(a).

196.     The EEOC has exceeded its statutory authority by, among other things: (1) construing and reformulating the term, "pregnancy, childbirth, or related medical conditions" in the PWFA and Title VII, rather than following Congress's instruction that it limit itself to "provid[ing] examples" of "reasonable accommodations"; (2) construing "medical conditions" to include abortion, in that abortion is not a "condition[]" and at any rate is not a subject on which Congress intended to delegate rulemaking or other authority to the EEOC under the PWFA; and (3) imposing the abortion accommodation mandate in the Final Rule.

197.     The Court affords no weight to the EEOC's interpretation of the PWFA and Title VII. *Loper*, 144 S. Ct. at 2273.

198.     No statutory definition exists for this phrase so the Court must begin with the plain meaning of the statute.

199.     The ordinary meaning of "pregnancy, childbirth, or related medical conditions," does not include abortion.

200.     Abortion does not fit any technical interpretation of a "related medical condition[]" of pregnancy or childbirth.

201.     The major questions doctrine also bars the abortion accommodation mandate in the Final Rule and the EEOC's interpretation of the PWFA and Title VII to include abortion.

202.     The major questions doctrine is the well-established presumption that Congress does not authorize agencies to issue regulations regarding "question[s] of deep economic and

political significance . . . without a clear statement to that effect" in the statute. *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023).

203.    Abortion is a "question of profound moral and social importance," *Dobbs*, 597 U.S. at 269, as well as a "difficult question[] of American social and economic policy," *id*. at 338 (Kavanaugh, J., concurring).

204.    Accordingly, abortion leave and discrimination based on abortion are questions of "deep . . . political significance" which thereby trigger the major questions doctrine. *Biden*, 143 S. Ct. at 2375.

205.    Like the Constitution, the PWFA is silent on abortion.

206.    If Congress wanted to work a revolution in federal regulation, asserting authority over a massively important political and social concern like abortion and compulsory paid abortion leave via Title VII and the PWFA in the wake of *Dobbs*, it would have done so explicitly. The EEOC's attempt to contravene the PWFA's purposeful decision not to include abortion within its mandate, without any nod from Congress, violates the major questions doctrine.

207.    The inclusion of abortion in the phrase "pregnancy, childbirth, and related medical conditions" in the Final Rule and the PWFA and Title VII, as interpreted and enforced by EEOC, exceeds the EEOC's statutory authority.

208.    Because the EEOC has exceeded its statutory authority, Plaintiff will face irreparable and imminent harm absent a permanent and preliminary injunction.

## COUNT V

**Violation of Administrative Procedure Act and Declaratory Judgment Act:**
**In Excess of Statutory Jurisdiction and Short of Statutory Right to Religious Exemption**

209.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set forth herein.

210. Defendants are "agencies" under the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

211. The Final Rule is a "rule" under the APA. *Id*. §§ 551(4), 701(b)(2).

212. The Final Rule is "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id*. § 704.

213. The APA mandates "judicial review" of agency action where a person suffers "legal wrong because of agency action." *Id*. § 702.

214. The APA requires a "reviewing court" to "hold unlawful and set aside agency action found to be in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id*. § 706(2)(C).

215. The PWFA incorporates Title VII's religious exemption. 42 U.S.C. § 2000gg–5(b) (citing *id*. § 2000e–1(a)).

216. Title VII's religious exemption states "[t]his subchapter shall not apply . . . . to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." *Id*. § 2000e–1(a).

217. Title VII defines "religion" as "all aspects of religious observance and practice, as well as belief." *Id*. § 2000e(j).

218. The Foundation qualifies as a "religious corporation, association, educational institution, or society" under 42 U.S.C. § 2000e–1(a).

219. The Court does not defer to the EEOC's interpretation of the PWFA and Title VII's religious exemption. *Loper*, 144 S. Ct. at 2273.

220.   The EEOC has taken the position that the PWFA "allows religious employers to prefer people who practice their religion in hiring and firing, and in making comparable pregnancy accommodations, but it does not otherwise exempt employers from their obligations under the PWFA to provide reasonable accommodations that do not pose an undue hardship." 89 Fed. Reg. at 29,146. In other words, the EEOC maintains that the PWFA only exempts employers from religious discrimination claims, even though those types of claims cannot even be brought under the PWFA.

221.   The EEOC's position violates the texts of Title VII and the PWFA.

222.   Title VII's exemption applies to the entire "subchapter" and therefore applies to any claim that can be made under Title VII beyond claims for religious discrimination.

223.   This blanket exemption applies equally to a claim under the PWFA.

224.   It exempts religious organizations like the Foundation from any mandate of the PWFA that violates the Foundation's religious practices, without requiring any showing of "undue hardship." And the exemption for religious organizations like the Foundation is not limited to plaintiffs-employees' claims alleging religious discrimination; it includes any claim that plaintiffs-employees would bring under the PWFA—for example, for failure to provide accommodations for abortions. Yet the EEOC would not allow the religious exemption to cover such a claim. Indeed, it would limit the religious exemption to religious discrimination claims—claims not even covered under PWFA in the first place.

225.   This religious exemption under Title VII and the PWFA is a "statutory right." 5 U.S.C. § 706(2)(C).

226. The EEOC's narrowing of the PWFA's and Title VII's religious exemptions in the Final Rule exceeds the EEOC's "statutory jurisdiction, authority, or limitations" and falls "short of [the Foundation's] statutory right[s]" to religious exemptions under the PWFA and Title VII. *Id*.

227. As a result, the Foundation faces the threat of lawsuits and/or enforcement actions by the EEOC.

228. Because the EEOC has exceeded its statutory authority, Plaintiff will face irreparable and imminent harm absent a permanent and preliminary injunction.

<u>**COUNT VI**</u>

**Violation of Administrative Procedure Act and Declaratory Judgment Act:**
**Arbitrary and Capricious**

229. Plaintiff realleges and incorporates the foregoing paragraphs as if fully set forth herein.

230. Defendants are "agencies" under the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

231. The Final Rule is a "rule" under the APA. *Id*. §§ 551(4), 701(b)(2).

232. The Final Rule is "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id*. § 704.

233. The APA mandates "judicial review" of agency action where a person suffers "legal wrong because of agency action." *Id*. § 702.

234. The APA requires a "reviewing court" to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2)(A).

235. An agency acts in an arbitrary and capricious manner if it does the following:

The agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

42

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Missouri ex rel. Bailey v. United States Dep't of Interior, Bureau of Reclamation*, 73 F.4th 570, 576–77 (8th Cir. 2023).

236.    The EEOC has "promulgated an arbitrary and capricious rule by entirely failing to consider an important aspect of the problem or offering an explanation for its decision that runs counter to the evidence before it." *Little Sisters of the Poor*, 591 U.S. at 682 (cleaned up).

237.    With respect to Title VII and the PWFA, the EEOC was aware of the "years of protracted litigation," *id.* at 663, caused by a similar federal agency mandate to provide abortifacient coverage in or through the health insurance plans of objecting religious employers. That mandate and related regulations were subject to "numerous" challenges by a "host of . . . entities," which led to the Supreme Court granting certiorari in at least seven cases from several circuits. *Id.* at 669-70, 673-74.

238.    Moreover, the EEOC was aware of "concerns raised in public comments and court filings in dozens of cases—encompassing hundreds of organizations"—over that previous mandate. *Id.* at 682 (cleaned up).

239.    Yet, in promulgating its own abortion-accommodation mandate that burdens the consciences of employers with religious objections in the same or worse ways, the EEOC essentially ignored the lessons learned from over a decade of nationwide litigation over a similar federal-agency mandate, as well as the 54,000 objections to its own proposed mandate.

240.    In promulgating the Final Rule to the PWFA, the EEOC has arrogated to itself the power to decide the applicability of RFRA and the First Amendment rather than following the Supreme Court's precedents in *Little Sisters of the Poor* and *Hobby Lobby*.

241.     Moreover, the EEOC has failed to apply the blanket religious exemption provided for by Title VII as required by the PWFA.

242.     Rather, the EEOC only adjudicates the PWFA's and Title VII's religious exemptions on a case-by-case basis after an enforcement action is brought. And the EEOC would only extend the exemption to protect employers like the Foundation from a narrow class of plaintiff-employee claims—religious discrimination claims—that are not even created under the PWFA.

243.     The Foundation can only assert its rights under the PWFA's and Title VII's religious exemptions, RFRA, and the First Amendment *after* an enforcement action is brought against it, and *only* as affirmative defenses, which in turn are subject to the EEOC's judgment and whim.

244.     The Final Rule, as interpreted and enforced by EEOC, is arbitrary and capricious.

245.     Because of the EEOC's arbitrary and capricious action, the Foundation faces the threat of enforcement action and lawsuits without the defenses provided by the PWFA/Title VII, RFRA, and the First Amendment, as well as heightened costs due to litigation to assert its rights under PWFA/Title VII, RFRA, and the First Amendment.

246.     Because of the EEOC's arbitrary and capricious rule, the Foundation faces irreparable and imminent harm absent a permanent and preliminary injunction

## **PRAYER FOR RELIEF**

Plaintiffs respectfully ask the Court:

A.     Enter a declaratory judgment that the Final Rule's inclusion of abortion is unlawful under the APA because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

B.     Set aside the Final Rule's inclusion of abortion as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power,

44

privilege, or immunity; or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

C.      Enter a declaratory judgment that the phrase "pregnancy, childbirth, or related medical conditions" in the PWFA and Title VII does not include abortion;

D.      Enjoin the EEOC from enforcing the Final Rule, the PWFA, and Title VII to include abortion in the phrase "pregnancy, childbirth, or related medical conditions";

E.      Declare that the Foundation is entitled to a religious exemption under the PWFA and Title VII;

F.      Declare that RFRA bars application of the abortion accommodation mandate in the Final Rule, and the inclusion of abortion in the phrase "pregnancy, childbirth, or related medical conditions" of the PWFA and Title VII, as interpreted and enforced by the EEOC, against the Foundation;

G.      Declare that the First Amendment bars application of the abortion accommodation mandate in the Final Rule, and the inclusion of abortion in the phrase "pregnancy, childbirth, or related medical conditions" of the PWFA and Title VII, as interpreted and enforced by the EEOC, against the Foundation;

H.      Enjoin enforcement of the abortion accommodation mandate in the Final Rule, and the inclusion of abortion in the phrase "pregnancy, childbirth, or related medical conditions" of the PWFA and Title VII, as interpreted and enforced by the EEOC, against the Foundation;

I.      Award the Foundation costs in the action and reasonable attorneys fees; and

J.      Enter all other relief the Court deems just and proper.

Plaintiffs also hereby request a jury on all issues triable.

45

Dated: October 4, 2024                  Respectfully submitted,

**GRAVES GARRETT GREIM LLC**

*/s/ Edward D. Greim*
Edward D. Greim (MO 54034)
Katherine E. Graves (MO 74671)
Michael Scott (MO 74361)
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com
kgraves@gravesgarrett.com
mscott@gravesgarrett.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Edward D. Greim, hereby certify that on October 4, 2024, I electronically filed the foregoing Complaint with the Clerk of the Court using the Court's CM/ECF system. Additionally, I certify that a physical copy of the foregoing was served on the below non-CM/ECF participants via the United States Postal Service:

U.S. Equal Employment Opportunity Commission
131 M Street, NE
Washington, DC 20507

Charlotte A. Burrows
131 M Street, NE
Washington, DC 20507

*/s/ Edward D. Greim*
Edward D. Greim
*Attorney for Plaintiff*
