## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| THE STANLEY M. HERZOG FOUNDATION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 4:24-cv-00651-RK |
| v. | ) ) | |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; ANDREA R. LUCAS,[1] | ) ) ) | |
| Defendants. | ) ) | |

## <u>ORDER</u>

The Stanley M. Herzog Foundation (the "Foundation") brings this case against Defendant Equal Employment Opportunity Commission ("EEOC") and its Acting Chair,[2] challenging the *Implementation of the Pregnant Workers Fairness Act*, 89 Fed. Reg. 29,096 (Apr. 19, 2024), under the Religious Freedom Restoration Act, the Free Exercise Clause of the U.S. Constitution, and the Administrative Procedure Act. Specifically, the Foundation argues that the Final Rule impermissibly requires employers to accommodate employees who obtain abortions in violation of its sincere religious beliefs.

Before the Court is the Foundation's motion for preliminary injunction. (Doc. 14.) This motion is fully briefed. (Docs. 15, 19, 23.) Also before the Court is Defendants' joint motion to dismiss for lack of subject-matter jurisdiction, (Doc. 30), which is also fully briefed, (Docs. 30-1, 39, 50). After careful consideration and review, the Court **ORDERS** that the Defendants' joint motion to dismiss is **DENIED**, and the Foundation's motion for preliminary injunction is **GRANTED**.

---

[1] Since the filing of the Complaint, Andrea R. Lucas has become the Acting Chair of the EEOC, replacing Charlotte Burrows, the former Chair. Pursuant to Federal Rule of Civil Procedure 25(d), Lucas is automatically substituted as a defendant.

[2] The Court uses "EEOC" throughout to refer to both the agency and its Acting Chair.

**Background**

## I. Pregnant Workers Fairness Act

In 2022, Congress passed the Pregnant Workers Fairness Act ("PWFA") to address gaps in existing legislation regarding protections for pregnant workers. The PWFA's requirements generally apply to any private employer with 15 or more employees. 42 U.S.C. § 2000gg(2).

Most relevant here, the PWFA makes it an unlawful employment practice for a covered entity to "not make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 2000gg-1(1). Employers are also prohibited from taking "adverse action against an employee on account of the employee requesting or using a reasonable accommodation to the known limitations related to the pregnancy, childbirth, or related medical conditions of the qualified employee." § 2000gg-1(5). The term "known limitation" is defined as a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions," § 2000gg(4), but the PWFA does not further define the term "related medical conditions."

The PWFA adopts the powers, remedies, and procedures under Title VII for any allegations of unlawful employment practice in violation of the PWFA. 42 U.S.C. § 2000gg-2. These procedures authorize the EEOC to investigate charges alleging unlawful employment practices and to intervene in actions against private employers or alternatively issue right to sue letters to employees who may then bring private suits against their employers. *See* 42 U.S.C. §§ 2000e-4(g)(6), 2000e-5. Additionally, the PWFA incorporates Title VII's exemption for religious employers. *See* 42 U.S.C. § 2000gg-5(b) (adopting 42 U.S.C. § 2000e-1(a)). The incorporated exemption states that "[t]his title shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e-1(a).

## II. Final Rule

To provide further guidance to employers, the PWFA instructed that, "[n]o later than 1 year after the date of enactment of this Act, the [EEOC] shall issue regulations . . . to carry out this division. Such regulations shall provide examples of reasonable accommodations addressing

known limitations related to pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-3(a).

Pursuant to Congress's directive, and after notice and comment, the EEOC promulgated the *Implementation of the Pregnant Workers Fairness Act*, 89 Fed. Reg. 29,096 (Apr. 19, 2024) ("Final Rule"), and accompanying interpretive guidance.[3] The Final Rule defines "related medical conditions" as "medical conditions relating to . . . pregnancy or childbirth," and provides examples including "termination of pregnancy, including via miscarriage, stillbirth, or abortion." 29 C.F.R. § 1636.3(b). Therefore, inserting the definition of "related medical conditions" from the Final Rule into the PWFA, the PWFA requires covered entities to make reasonable accommodations to employees who receive an abortion and prohibits covered entities from taking adverse employment actions against employees who request or use accommodations in relation to receiving an abortion—unless the covered entity is entitled to an exemption or defense.

The Final Rule notes that the PWFA incorporated the religious employer exemption from Title VII, *see* 29 C.F.R. § 1636.7(b), but declines to adopt a blanket exemption for religious employers. Instead, the merits of an employer's defense that it took a proscribed action on the basis of religion will be determined on a "case-by-case" basis during the investigative phase. 89 Fed. Reg. 29,146-47. The interpretive guidance further explains that the EEOC does not have authority to "provide legally binding responses to employer inquiries about the potential applicability of religious or other defenses before" an individual files a charge of discrimination against a covered entity. *Id.* at 29,147. Therefore, the determination of whether an employer has a valid religious exemption will not occur until after an individual files a charge of discrimination and an EEOC investigation commences.

### III. Procedural History

The Foundation is a Christian nonprofit organization whose mission is "to catalyze and accelerate the development of quality Christ-centered K-12 education" and "support Christ-centered, non-denominational, Protestant Christian schools." (Doc. 1-2 at 5-6.) The Foundation subscribes to the belief that "God creates human life in the womb, and that abortion is the unjustified taking of innocent human life." (*Id.* at 6.) As a result of this belief, the Foundation "does not and will not provide any workplace accommodation for an employee to obtain an

---

[3] The regulations in the Final Rule were codified at 29 C.F.R. § 1636 *et seq.* The Court refers to the regulations as codified in the C.F.R. and the interpretive guidance at its citation in the Federal Register.

Case 4:24-cv-00651-RK    Document 55    Filed 03/18/25    Page 3 of 23

abortion. Obtaining an abortion is grounds for adverse employment action, up to and including termination." (Doc. 1-4 at ¶ 17.) The Foundation employs more than 15 employees and is thus subject to the requirements of the PWFA.

The Foundation commenced this action against the EEOC on October 4, 2024, by filing a complaint alleging violations of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 ("RFRA"), the Free Exercise Clause of the First Amendment of the U.S. Constitution, and the Administrative Procedure Act ("APA"). (*See generally* Doc. 1.) On January 7, 2025, the Foundation filed a motion for preliminary injunction requesting that the Court enjoin enforcement of the Final Rule, the PWFA, and Title VII of the Civil Rights Act, to the extent they compel the Foundation to accommodate abortion under the Final Rule.

The Court scheduled a hearing on the motion for preliminary injunction for February 21, 2025. (Doc. 27.) On February 20, 2025, the EEOC filed a motion to stay the preliminary injunction hearing. (Doc. 33.) In this motion, the EEOC argued that two recent developments justified staying the preliminary injunction hearing: (1) the EEOC issued a "Position of Acting Chair Lucas Regarding the Commission's Final Regulations Implementing the Pregnant Workers Fairness Act," (Doc. 33-2), which indicated Lucas's intent to revisit the Final Rule being challenged in this litigation once the EEOC regains a quorum of commissioners, and (2) the Eighth Circuit's decision in *Tennessee v. EEOC*,[4] which was issued earlier that day. (*Id.*) Counsel for the EEOC represented that, in light of the Acting Chair's statement, they were "unable to provide substantive argument" as to the likelihood of success on the merits—in other words, the EEOC would not provide substantive arguments regarding Plaintiff's RFRA, First Amendment, and APA claims. (Doc. 33 at 1.) The Court scheduled a hearing on the motion to stay the following day to be heard in combination with the previously scheduled hearing for preliminary injunction. (Doc. 34.)

The Court held a hearing on February 21, 2025. (Doc. 38.) At the hearing, the Court began with consideration of the motion to stay—but gave leeway to the parties introducing argument as to the preliminary injunction motion due to an overlap in the issues. The EEOC maintained its position that it would not provide substantive argument as to the merits of the Foundation's claims, but instead argued that the Foundation lacks standing, that the case is not ripe, and that the

---

[4] *See Tennessee v. EEOC*, No. 24-2249, 2025 WL 556191 (8th Cir. Feb. 20, 2025)

Foundation cannot show irreparable harm. (Doc. 40 at 5:19-12:23.) The Foundation argued that the EEOC did not meet the standard for granting a stay, and that despite the Acting Chair's statement that the EEOC intended to reconsider the Final Rule, the Final Rule is still in effect and the EEOC has not disavowed enforcement of the Final Rule. (Doc. 40 at 13:10-14:21.) The Court denied the request to stay, recessed for the day, and scheduled the preliminary injunction hearing to resume on March 11, 2025. (Doc. 40 at 34:25-35:5, Doc. 37.)

On March 6, 2025, the EEOC filed a motion to vacate the notice of hearing for March 11, 2025. (Doc. 44.) In its suggestions in support, the EEOC highlighted its continuing lack of quorum, (*id.* at ¶ 1), and stated it "has no objection to the Court construing Defendants as [both] 'resting on the[ir] brief,'" and on their previous arguments as to ripeness and irreparable harm made at the February 21, 2025 hearing. (*Id.* at ¶¶ 6, 7.) The Foundation opposed the motion to vacate the hearing. (Doc. 48.) After careful review, the Court granted the motion to vacate the hearing. (Doc. 53.) The Court now decides the pending motion for preliminary injunction and motion to dismiss.

Further facts are set forth as necessary.

**Discussion**

## I. EEOC's Motion to Dismiss (Doc. 30)

The Court begins with the EEOC's motion to dismiss for lack of subject-matter jurisdiction, as Article III standing and ripeness are prerequisites to a plaintiff's ability to proceed in federal court. Since the EEOC filed its motion to dismiss, the Eighth Circuit issued its decision in *Tennessee v. EEOC*, which addresses issues of standing in the context of a pre-enforcement challenge to the Final Rule by a group of states. *See generally* 2025 WL 556191. In its reply brief, the EEOC notes that this decision bears on the injury-in-fact, traceability, and redressability arguments raised in its opening brief. However, it argues that even if *Tennessee v. EEOC* establishes standing—a point the EEOC does not clearly concede—this case should be dismissed because it is not ripe. Absent a clear concession on the issue of standing by the EEOC, and Plaintiff's lack of opportunity to brief the standing issue post-*Tennessee v. EEOC*, the Court considers both standing and ripeness fully herein.

### A. Standing

In its opening brief on its motion to dismiss, the EEOC argues that the Foundation has not suffered an injury-in-fact because any potential injury is too speculative. The EEOC also argues

5

that the Foundation's alleged injuries are not fairly traceable to the EEOC's actions and that the requested relief would not redress such injuries. To establish Article III standing, the Foundation must show "(1) that [it] suffered an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) that a favorable decision will likely redress the injury." *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

### 1. Injury-in-Fact

The EEOC argues that the Foundation's alleged injuries are too speculative and fail to meet the "injury-in-fact" element of standing. The EEOC contends that because no enforcement action has been initiated, there would have to be a long chain of events that must occur before the Foundation could have a valid claim of an injury-in-fact, and therefore, the Foundation lacks standing. The Foundation replied by identifying two specific injuries: (1) the burdens and costs associated with complying with the Final Rule, and (2) the credible threat of enforcement of the Final Rule, which pressures the Foundation to choose between its religious beliefs and compliance with the Final Rule. The Court addresses each alleged injury in turn.

### a. Compliance Costs

The Foundation points to the costs of complying with the Final Rule and other regulatory burdens imposed by the Final Rule as one basis for satisfying the injury-in-fact requirement for Article III standing. Since the initial briefing on the motion to dismiss, the Eighth Circuit issued its decision in *Tennessee v. EEOC*. The Court finds this case binding on the question of whether a regulatory burden, such as compliance costs, is sufficient to establish injury-in-fact in this situation.

In *Tennessee v. EEOC*, Tennessee and sixteen other states challenged the Final Rule as violating the APA, the First Amendment, and federalism principles. *Tennessee*, 2025 WL 556191, at *1. The Eighth Circuit found that the plaintiff-states had standing because the states were an object of the Final Rule, which imposed new regulatory obligations on the states as employers. *Id.* at *2. The Eighth Circuit explained:

> Where a plaintiff is the object of a regulatory action, "there is ordinarily little question that the action or inaction has caused [the plaintiff] injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561-62. A regulated party has a "concrete interest . . . in avoiding regulatory obligations above and beyond those that can be statutorily imposed upon them. *Iowa League of Cities v. EPA*, 711 F.3d 844, 871 (8th Cir. 2013).

6

*Id.* In *Tennessee*, the Eighth Circuit reversed the district court's finding that the plaintiff-states lacked standing, stating that "[b]ecause the States are the object of an agency action [the Final Rule], they are injured by the imposition of new regulatory obligations." *Id.* Furthermore, the states were challenging the Final Rule in their role as employers. *Id.* (noting that meeting obligations under the Final Rule requires updating employment policies and training staff, which requires immediate action and establishes injury-in-fact). Therefore, the Eighth Circuit's standing analysis is applicable in this case to the Foundation, who has sued in its capacity as an employer.

The Foundation here has identified specific actions that it would need to take to comply with the abortion accommodation mandate, such as revising company policies and implementing training programs for staff. (Doc. 15-3 at ¶ 24.) These allegations are neither conjectural or abstract and would entail costs. Specifically, the Foundation estimates that it would take "well over 160 hours of employee time to review, analyze, and implement the abortion accommodation requirements contained in the Final Rule," (Doc. 23-1 at ¶ 9), and "that costs beyond employee time needed to implement the Final Rule's abortion accommodation requirements would be $2,260," (*id.* at ¶ 10). The Court concludes, pursuant to *Tennessee v. EEOC*, that the Foundation has established a sufficient injury-in-fact based on the regulatory obligation and compliance costs imposed by the Final Rule.

### b. Threat of Enforcement

The Foundation also relies on the credible threat of enforcement to establish an injury-in-fact to show standing. In a pre-enforcement challenge, a plaintiff may establish a sufficient injury-in-fact by demonstrating that: (1) they intend to engage in a course of conduct arguably affected with a constitutional interest; (2) that conduct is proscribed by statute; and (3) there exists a credible threat of enforcement under the statute. *Susan B. Anthony List v. Driehaus*, 573 U.S. 159, 161 (2014).[5] "[W]e have permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent." *Id.* at 159.

First, the Foundation states that it intends to continue to operate its organization in accordance with its religious beliefs—including the belief that "abortion is the unjustified taking of innocent human life" (Doc. 15-3 at ¶ 11)—which it asserts are safeguarded by the First

---

[5] This framework has been applied in the context of administrative regulations, as well as statutes. *See Religious Sisters of Mercy*, 55 F.4th at 607 (applying *Susan B. Anthony List* framework to EEOC regulations interpreting Title VII); *Louisiana v. EEOC*, 705 F. Supp. 3d 643, 656 (W.D. La. 2024) (applying framework to Final Rule at issue in this case).

7

Amendment. In support of its position, the Foundation points to its internal policies—for example, a director's statement declaring, "[t]he Foundation will take appropriate adverse employment action against any applicant, employee, or former employee whose speech, advocacy, or conduct undermines the [Foundation's] teachings . . . or . . . policies with respect to abortion." (Doc. 15-3 at ¶ 20.) The Foundation also attests that it will not provide *any* abortion accommodations. (*Id.* at 17.) The Foundation argues that such policies are inherently linked to its religious convictions and are thus affected with a constitutional interest. The Court agrees.

Second, the Court considers whether denying accommodations for abortions or taking adverse employment actions against employees who seek or use such accommodations is likely proscribed by the Final Rule. The Final Rule defines "related medical conditions" to include abortion. The PWFA requires employers to make reasonable accommodations to employees for "pregnancy, childbirth, and related medical conditions." Therefore, the language of the Final Rule requires employers to accommodate employees who obtain abortions—unless the employer can show the PWFA's religious exemption, as interpreted by the Final Rule, applies to it.

The PWFA incorporates Title VII's religious exemption which states that a "religious corporation, association, educational institution, or society" is exempt from the entire subchapter regarding the employment of individuals of a particular religion. *See* 42 U.S.C. § 2000gg-5 ("This division is subject to the applicability to religious employment set forth in section 702(a) of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-1(a)).). According to the Foundation, the EEOC's Final Rule misconstrues the plain meaning of the statute. Rather than embracing the broad religious exemption provided by Title VII, the EEOC's interpretation of the PWFA limits the exemption to claims of religious discrimination only. *See* 89 Fed. Reg. at 29,146;[6] *see also Louisiana*, 705 F. Supp. 3d at 662. The Foundation contends this narrow view improperly rewrites

---

[6] This portion of the interpretive guidance states

Under the Commission's interpretation of section 107(b), the PWFA does not fully exempt qualifying religious organizations from making reasonable accommodations. This is analogous to section 702(a), which likewise does not operate as a total exemption from Title VII's requirements.

Under section 702(a), for example, qualifying religious organizations are exempt from Title VII's prohibition against discrimination on the basis of religion, but, as U.S. courts of appeals have recognized, qualifying religious organizations are still subject to the law's prohibitions against discrimination on the basis of race, color, sex, and national origin . . . .

89 Fed. Reg. at 29,146-47.

the statute such that the Foundation is not exempt based on its religious beliefs from any requirement to provide accommodations for abortions. Because of this interpretation, any invocation of a religious defense in situations other than religious discrimination claims comes after a complaint is brought against an employer, rather than providing an up-front exemption from investigation and prosecution. Thus, the Foundation correctly asserts that its constitutionally affected conduct—denying accommodations for abortion and taking adverse employment actions against employees who seek or use the same—is likely proscribed by the Final Rule.[7]

Third, there must be a credible threat of enforcement. Where conduct is proscribed by the challenged regulation, uncertainty about whether the defendant intends to enforce the regulation is sufficient to establish a threat of enforcement. *See Religious Sisters of Mercy*, 55 F.4th at 604-05 ("The government's assertion that it has not to date evaluated whether it will enforce Section 1557 against the plaintiffs is actually a concession that it may do so." (cleaned up)); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022) (finding threat of enforcement where HHS repeatedly refused to disavow enforcement). Here, the EEOC has not made any promises that it will refrain from enforcing the abortion accommodation mandate against religious employers like the Foundation. Instead, it has repeatedly stated that it cannot guarantee non-enforcement. (Doc. 35-1 at 2, Doc. 40 at 6:3-4 ("The EEOC is not able to commit to nonenforcement at this time.").)

Additionally, the EEOC maintains it cannot decide an employer's religious defenses before a complaint is filed against it because of its "case-by-case" standard. "The EEOC's reliance on its case-by-case standard constitutes 'a concession that it may' seek enforcement.'" *Cath. Benefits Ass'n v. Burrows*, 732 F. Supp. 3d 1014, 1022 (D.N.D. 2024) (quoting *Franciscan All.*, 47 F.4th at 376). While the Foundation would be able to raise a religious defense during the investigatory stage, "[a] religious defense is not the same as a religious exemption." *Id.* The EEOC's operative case-by-case standard, in combination with its unwillingness or inability to enter a nonenforcement agreement with the Foundation, is effectively an open admission that it retains the power and discretion to enforce the mandate, which constitutes a credible threat of enforcement.[8]

---

[7] The Court makes no determination as to whether the Final Rule and its accompanying interpretive guidance correctly interprets the PWFA's religious exemption. Instead, the EEOC's interpretation of the religious exemption is mentioned only to show that under the existing law, employers must be more cautious ahead of time and accordingly feel pressure to comply with the Final Rule to the extent that they must accommodate employees who obtain abortions or risk investigation and prosecution.

[8] The Court finds a credible threat of enforcement based on this analysis despite the EEOC's argument that that "numerous contingencies would all have to occur" for injuries to materialize. (Doc. 19

While the EEOC's Acting Chair has indicated her intent to revisit the Final Rule once the EEOC regains a quorum of commissioners, the Court notes that in the meantime the Final Rule remains the law as a result of the formal rulemaking process, and the EEOC cannot disavow enforcement or act to change the Final Rule at this time. This unique set of circumstances distinguishes this case from those where an administrative agency has a quorum to act, is actively engaged in the rule amendment process, and provides for non-enforcement of the challenged rule during the amendment process. *See, e.g.*, *Cath. Diocese of Nashville v. Sebelius*, No. 3-12-0934, 2012 WL 5879796, at *3-4 (M.D. Tenn. Nov. 21, 2012) (holding plaintiffs lacked standing to bring RFRA and APA claims where the Department of Health and Human Services was engaged in active amendment process and provided a one-year safe harbor from enforcement of the challenged rule during that time). In light of the particular facts and circumstances in this case, the Court concludes that a credible threat of enforcement remains, and the Foundation has established an injury-in-fact on this basis, as well.

### 2. Traceability and Redressability

The EEOC also argues that the Foundation's injuries are not traceable to the EEOC's actions and that the requested relief will not redress those injuries. As to the compliance costs injury, the Court finds *Tennessee v. EEOC* binding on this issue. While the Eighth Circuit's decision largely focused on injury-in-fact, and does not explicitly address traceability and redressability, these elements are necessary to concluding that the states have standing based on the regulatory burdens imposed by the Final Rule.

As for the threat of enforcement injury, the EEOC denies traceability and redressability by asserting that it is not the sole cause of the Foundation's claimed injury. The EEOC argues the injuries are also attributable to lawsuits filed by private individuals (usually aggrieved employees) alleging violations of the PWFA and Final Rule, and thus the Court cannot trace all of the Foundation's injuries to the EEOC nor redress the injuries completely in this action.

To satisfy the traceability requirement, the Foundation needs to show "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. This connection does not have to be direct or absolute, but it does need to be more than speculative. In other words, the Foundation must show that its injuries arise, at least in part, from the EEOC's actions or potential

---

at 16.) Two other courts have rejected this argument in the context of private employers. *See Cath. Benefits Ass'n*, 732 F. Supp. 3d at 1023; *Louisiana*, 705 F. Supp. 3d at 655-56.

actions. *See California v. Texas*, 593 U.S. 659, 669 (2021) (finding no traceability where defendant could not enforce challenged provision against plaintiff).

Here, the Foundation argues that the EEOC is directly responsible for enforcing the abortion accommodation mandate promulgated by the Final Rule, and that this mandate creates the very compliance burdens and potential penalties the Foundation is trying to avoid. Because the EEOC is the agency with the power to enforce this rule, it is reasonable to conclude that in enacting this rule, the EEOC is the party responsible for the Foundation's alleged injuries. *See Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) (Traceability "requires the named defendants to possess authority to enforce the complained-of provision."). While the EEOC may not be the sole cause of the Foundation's injuries, traceability does not require the defendant to be the only cause of the injury. *See Bennett v. Spear*, 520 U.S. 154, 169 (1997) (finding traceability where conduct of defendant is in a causal chain, but not the final step necessary to cause the injury). Here, the EEOC's actions in implementing the Final Rule, investigating charges filed by employees, and enforcing the Final Rule contribute to the Foundation's alleged injuries.

Similarly, to satisfy the redressability requirement, the Foundation must show a reasonable likelihood that the requested relief will address some injury the plaintiff faces. *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982).

The EEOC argues that even if the Final Rule is enjoined, the Foundation could still face lawsuits from private individuals. The Court finds that if the Foundation is successful in this proceeding, then the Court can at the very least redress the Foundation's injuries arising from the EEOC's own actions. This is sufficient to find redressability. *Id.* Furthermore, it is possible that relief from the Court could address potential injuries arising from suits brought by private individuals to a degree. *See, e.g.*, *Louisiana*, 705 F. Supp. 3d at 664 (preliminarily enjoining issuance of right-to-sue letters). The Court concludes that some of the Foundation's injuries are traceable to the EEOC and that a decision in favor of the Foundation could redress some, if not all, of its injuries.

For all the reasons stated above, the Court finds that the Foundation has demonstrated Article III standing.

11

### B. Ripeness

Having concluded that the Foundation has standing to bring its claims, the Court next addresses the EEOC's argument that the Foundation's case is not ripe. The EEOC argues that the Foundation's claims are not ripe because (1) delayed review will not cause any harm to the Foundation, (2) further factual development is warranted before the Court reviews the case, and (3) judicial intervention would inappropriately interfere with further administrative action.

Ripeness is a closely related doctrine to standing that "originates from the same Article III limitation" that federal courts adjudicate only cases and controversies. *See Religious Sisters of Mercy*, 55 F.4th at 608 (quoting *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 997 (8th Cir. 2022)). A plaintiff "must show both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration to demonstrate that an alleged dispute is ripe for review. *Id.* (cleaned up). A case that "would not benefit from further factual development and poses a purely legal question not contingent on future possibilities . . . is fit for judicial decision. In this case, standing and ripeness essentially boil down to the same question . . . ." *Id.* at 608 (citations omitted).

First, the EEOC argues the Foundation will not be harmed by a delay in review because the Foundation will have to choose between compliance with the Final Rule and its religious beliefs only when and only if an employee actually seeks an abortion-related accommodation. (Doc. 50 at 11.) This argument overlooks the compliance costs Plaintiff must incur as an employer to familiarize itself with the rule, post new EEO posters, and update its employment policies. *Tennessee*, 2025 WL 556191, at *2. EEOC argues that the Foundation has not shown it plans to imminently undertake those costs. (Doc. 50 at 11.) However, the Eighth Circuit drew a presumption in favor of the states, as employers, that

> covered entities must comply with the Rule, and we presume that the States will follow the law as long as the Rule is in effect. An employer cannot meet its obligations under the Rule without taking steps to ensure that its employees know their rights and obligations under the Rule. As a practical matter, the Rule requires immediate action by the States to conform to the rule, and this action produces an injury in fact.

*Id.* at 3.

The EEOC correctly notes that the Eighth Circuit did not explicitly consider ripeness in *Tennessee*, but its decision clearly perceives an imminent injury—which supports a finding that the Foundation will be harmed by a delay in review. Additionally, apart from the employee-time

and economic costs of compliance, merely updating its employee policies to comply with the Final Rule implicates the Foundation's religious beliefs. *Cf. id.* at *2 ("The States allege that the Rule compels them . . . to refrain from pro-life messaging that arguably would be 'coercive' and thus proscribed by the Rule."). To the extent the Final Rule requires the Foundation to refrain from advocating its pro-life beliefs or requires the Foundation to implement new employment policies and practices that include accommodations for abortion, the Foundation's religious beliefs are implicated.

Further, there is a threat of harm from delay with regard to the threat of enforcement, which causes the Foundation to choose between following its religious beliefs and risking enforcement or complying with the Final Rule. In pre-enforcement challenges based on constitutional rights, "standing and ripeness essentially boil down to the same question," and courts have "address[ed] the issue [of ripeness] in terms of standing." *See Religious Sisters of Mercy*, 55 F.4th at 608; *see also Cath. Benefits Ass'n*, 732 F. Supp. 3d at 1022 ("The Court finds there is standing and therefore the issues are ripe for adjudication."). This is true despite the EEOC's argument that it has not pursued any enforcement actions under the PWFA involving abortion. (Doc. 50-1 at ¶ 5.) As discussed above, lack of enforcement does not necessarily negate the threat of enforcement.[9] Additionally, while the EEOC has not pursued enforcement against employers specifically as to the abortion-accommodation provision of the Final Rule, it has engaged in enforcement actions related to the PWFA's requirement that employers accommodate employees for pregnancy-related conditions more generally.[10]

Second, the EEOC argues that further factual development is required before a court may assess the Foundation's religious-based claims. For example, the EEOC argues that "it is not clear if *every* abortion accommodation would impose a substantial burden on Plaintiff's religious views." (Doc. 50 at 13.) However, the Foundation has clearly stated that it "does not and will not

---

[9] Nor does the EEOC's lack of quorum necessarily negate the threat of enforcement. The EEOC represents that when it "lacks a quorum it also lacks authority to 'commence or intervene in litigation[s]' that EEOC's General Counsel determines 'are likely to generate public controversy.'" (Doc. 50 at 9 n.3.) While this decreases the risk of enforcement, it makes no representation as to the EEOC's ability or obligation to investigate charges filed by employees or to issue right to sue letters.

[10] *EEOC Sues Two Employers under the Pregnant Workers Fairness Act*, U.S. Equal Emp. Opp. Comm'n (Sept. 26, 2024), https://www.eeoc.gov/newsroom/eeoc-sues-two-employers-under-pregnant-workers-fairness-act [https://perma.cc/XD5N-3NKF]; *EEOC Ramps up Enforcement of Pregnancy Discrimination under PWFA*, Nat. L. Rev. (Nov. 5, 2024), https://natlawreview.com/article/eeoc-ramps-enforcement-pregnancy-discrimination-under-pwfa [https://perma.cc/2KPZ-JDFG].

provide *any* workplace accommodation for an employee to obtain an abortion" as a result of its religious beliefs. (Doc. 1-4 at ¶ 17 (emphasis added).) The EEOC also argues that the Court cannot decide whether the Government has a compelling interest in ensuring an employee has an accommodation, when no particular employee has yet to bring a complaint against the Foundation. The Foundation persuasively argues that RFRA's fact-specific inquiry imposes a rigorous burden on the government to satisfy strict scrutiny at the merits stage of a RFRA action, not a burden on the plaintiff to bring a justiciable claim in the first place. (Doc. 39 at 15 (citing *Gonzales*, 546 U.S. at 419-20).) *See also Cath. Benefits Ass'n*, 732 F. Supp. 3d at 1026-27 (assessing government's compelling interest without a particular employee complaint pending against the plaintiff).

Finally, the EEOC argues that judicial intervention would inappropriately interfere with further administrative action in light of Acting Chair Lucas's statement that she intends to reconsider the Final Rule once the EEOC regains a quorum. In support, the EEOC cites *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998), and *FTC v. Standard Oil Co.*, 449 U.S. 232 (1980). Both cases are distinguishable, not the least because they involved functioning administrative agencies with a quorum who were thus able to consider, reconsider, interpret, and reinterpret their regulations and rulings at the time of the courts' decisions. Additionally, in *FTC v. Standard Oil Co.*, the challenged agency action was the "issuance of a complaint" by the FTC which was "not a definitive ruling or regulation." *Id.* at 243. This is inapposite to the situation here where the EEOC has promulgated the Final Rule after the formal notice and comment process. The EEOC admits it cannot currently amend the Final Rule. The Court is thus not persuaded by the argument that judicial intervention will interfere with administrative action. Therefore, the Court concludes that the Foundation's claims are ripe for judicial review.

As the Court has found that the Foundation established standing and ripeness, the Defendants' joint motion to dismiss for lack of jurisdiction, (Doc. 30), is **DENIED**.

## II.    The Foundation's Motion for Preliminary Injunction

The Foundation requests that the Court enjoin enforcement of the Final Rule, the PWFA, and Title VII, to the extent they compel Plaintiff to accommodate abortion under the Final Rule. At this point, the EEOC contests the preliminary injunction based on lack of ripeness and irreparable harm. (Doc. 45 at ¶¶ 7-8.) The Foundation argues that the EEOC's current unwillingness or inability to argue on the merits (with respect to the likelihood of success on the merits factor) in a hearing before the Court constitutes a waiver of those arguments. However, the

14

Court finds that the EEOC did not waive these points and instead informed the Court that it is willing to rest on its briefs. (*Id.* at ¶ 6.) Therefore, the Court considers the preliminary injunction on its merits based on the briefing of the parties, (Docs. 15, 19, 23), and the hearing held February 21, 2025, (Doc. 38 (minute entry); Doc. 40 (hearing transcript)).

The Eighth Circuit considers motions for preliminary injunctions based on the following factors: (1) the threat of irreparable harm to the plaintiff, (2) the state of balance between such harm and the injury that granting the injunction will inflict on other parties, (3) the probability the plaintiff will succeed on the merits, and (4) the public interest. *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). "In balancing the equities no single factor is determinative." *Id.* at 113. However, "likelihood of success on the merits is the most important factor." *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022) (cleaned up).

### A. Likelihood of Success on the Merits

Typically, a movant must only show a "fair chance" of succeeding on the merits to support a motion for preliminary injunction. The "fair-chance standard does not require the party seeking relief to show a greater than fifty per cent likelihood that he will prevail on the merits." *D.M. v. Minn. High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019) (cleaned up). The Court finds that the Foundation meets this standard on its RFRA claim.

### 1. Religious Freedom Restoration Act Claim

RFRA provides "very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 53 U.S. 682, 693 (2014). Under RFRA, the

> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1(b). RFRA permits individuals to sue for relief. *Id.* § 2000bb-1(c). Further, the meaning of "person" in RFRA includes organizations like the Foundation. *See Hobby Lobby*, 573 U.S. at 707-08. The EEOC does not contest at this stage that the Foundation's religious beliefs regarding abortion are sincere. *See Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006) (noting prima facie RFRA case requires showing challenged rule "would (1) substantially burden (2) a sincere (3) religious exercise"). Therefore, the relevant questions are whether such beliefs are likely substantially burdened by the Final Rule, and if so, whether the Final Rule likely furthers a compelling governmental interest by the least restrictive means.

15

At the outset, the Court notes that two other district courts have preliminarily enjoyed the Final Rule, finding that plaintiffs similarly situated to the Foundation are likely to succeed on the merits of their claims challenging the Final Rule as it pertains to abortion accommodations and their religious beliefs. *See generally Cath. Benefits Ass'n v. Burrows*, 732 F. Supp. 3d 1014 (D.N.D. 2024); *Louisiana*, 705 F. Supp. 3d 643. While not dispositive, the Court is persuaded by the decisions of its fellow courts and looks to their reasoning in reaching its own conclusion.

### a. Substantial Burden

"A substantial burden exists when the Government forces a person to act, or refrain from acting, in violation of his or her religious beliefs, by threatening sanctions, punishment, or denial of an important benefit as a consequence for noncompliance." *Doe v. United States*, 901 F.3d 1015, 1026 (8th Cir. 2018) (citing *Hobby Lobby*, 573 U.S. at 724-26). Additionally, "a substantial burden is found if 'non-compliance would have substantial adverse practical consequences' and 'compliance would cause the objecting party to violate its religious beliefs, as it sincerely understands them.'" *Cath. Benefits Ass'n*, 732 F. Supp. 3d at 1026 (quoting *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 692 (2020) (Alito, J., concurring)) (cleaned up).

The Foundation has detailed its sincerely held religious beliefs about procreation and abortion. These beliefs include that "God creates human life in the womb, and that abortion is the unjustified taking of innocent human life." (Doc. 15-3 at ¶ 11.) The Foundation argues that the Final Rule forces it to act in a way contrary to its religious beliefs both by requiring it to accommodate employees who obtain abortions and prohibiting it from taking adverse employment actions against such employees. (*Id.* at ¶¶ 17-18.)

The EEOC has repeatedly represented that it cannot pre-judge RFRA claims or other religious defenses or grant religious exemptions prior to an employee bringing a complaint, which leaves religious organizations subject to a threat of enforcement.[11] This remains true despite the EEOC's contention that religious entities can assert religious defenses at a later point. The Foundation has shown a threat of enforcement of the Final Rule, which also supports finding a substantial burden on its free exercise because the Foundation must either violate its religious

---

[11] Most recently, the EEOC declined to enter a non-enforcement agreement with the Foundation on February 20, 2025, while this Court was considering whether to stay the preliminary injunction proceedings. (Doc. 35-1 at 2.)

beliefs or risk enforcement and penalties. *See Cath. Benefits Ass'n*, 732 F. Supp. 3d at 1029 ("The CBA is likely to succeed on the merits of the RFRA violation claim because the law forces members to choose between expressing sincerely held beliefs and compliance."). Additionally, the Final Rule seems to require the Foundation to employ someone even if they behave contrary to its religious beliefs; this too establishes a substantial burden. *Id.* at 1026 (citing *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 938 (5th Cir. 2023) ("Being forced to employ someone to represent the company who behaves in a manner directly violate of the company's convictions is a substantial burden and inhibits the practice of [the plaintiff's] beliefs.")).

Because the EEOC's interpretation of the PWFA in the Final Rule threatens litigation for adhering to sincerely held religious beliefs, likely requires employers to accommodate abortion, and likely prohibits employers from taking adverse actions against employees who obtain abortions, the Final Rule likely substantially burdens the Foundation's free exercise of religion because of its religious beliefs regarding abortion. *Id.*

### b. Compelling Interest

Because the Final Rule likely substantially burdens the Foundation's exercise of religion, the EEOC must demonstrate that the Final Rule advances a compelling governmental interest by the least restrictive means. *See Gonzales*, 546 U.S. at 429 (noting the burdens of proof at the preliminary injunction stage track the burdens at trial, and therefore the government must show a likelihood of success that its regulation promotes a compelling government interest by the least restrictive means). "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales*, 546 U.S. at 430-31. Therefore, courts have rejected generalized interests at this stage of the RFRA analysis. *See Braidwood Mgmt.*, 70 F.4th at 940 ("[The EEOC] does not show a compelling interest in denying Braidwood, individually, an exemption. The agency does not even attempt to argue the point outside of gesturing to a generalized interest in prohibiting all forms of sex discrimination in every potential case.").

The EEOC advances two main interests: (1) ensuring that qualified employees can remain in the workforce while receiving healthcare, and (2) eradicating workplace discrimination against women. The Foundation argues that these reasons are too broad, and the EEOC has not demonstrated why there is a compelling interest in denying the Foundation, in particular, an

17

exemption from the Final Rule. While the EEOC's asserted interests are more specific than a general interest in combatting discrimination, they nevertheless fail to meet the standard of showing that this specific exemption to this particular religious claimant would result in a hindrance. *See Cath. Benefits Ass'n*, 732 F. Supp. 3d at 1027 (rejecting EEOC's same interests in this context).

### c.    Least Restrictive Means

Even if the EEOC's interests were specific enough to show a compelling governmental interest as it relates to the Foundation in particular, the EEOC has not "shown that it [likely] lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." *Hobby Lobby*, 573 U.S. at 728; 42 U.S.C. § 2000bb-4 (requiring use of least restrictive means). Therefore, the EEOC has not established that it used the least restrictive means to advance its interests at this stage.

The Final Rule's approach requires employers to provide accommodations for employees who obtain abortions and permits a religious employer to assert a religious defense only after an employee brings a complaint against it for refusing to provide accommodations. There is no way for a religious employer to ensure it will not face investigation or prosecution ahead of time. The Foundation suggests a number of alternatives the EEOC could have taken, which are less restrictive of its free exercise rights: the EEOC could (1) foreswear enforcement against religious organizations whose religious exercise is burdened by the Final Rule, (2) mimic the Department of Education's "assurance of exemption" system, or (3) have an exemption for religious employers at the outset. The EEOC argues these alternatives are not feasible because the PWFA does not give it authority to predetermine religious exemptions or defenses.

Ultimately, the burden is on the EEOC to "prove with evidence" that its policies are the least restrictive means "to achieve its compelling interest, including alternative forms of regulation." *Cath. Benefits Ass'n*, 732 F. Supp. 3d at 1027 (citing *Hobby Lobby*, 573 U.S. at 727-28). In *Catholic Benefits Association*, the court concluded that providing a specific exemption for religious employers could be a less restrictive means than the after-the-fact case-by-case consideration of religious defenses. *Id.* at 1027 (finding that a specific exemption for religious employers is less restrictive and within the EEOC's authority).[12] At this stage, the EEOC has not

_____

[12] The Foundation also contends that the EEOC improperly interpreted the religious exemption in the PWFA, as adopted from Title VII, and that the EEOC's interpretation impermissibly limits the

18

shown that it is likely the Final Rule is the least restrictive means to achieving its goals, even assuming those goals are compelling governmental interests. Therefore, the Foundation is likely to succeed on the merits of its RFRA claim.

### 2. First Amendment and Administrative Procedure Act Claims

The Foundation also argues that the Final Rule violates the Free Exercise Clause of the U.S. Constitution and the APA. Specifically, the Foundation argues that the Final Rule violates the Free Exercise Clause because it burdens religion, is not a neutral rule of general applicability, and cannot satisfy strict scrutiny for the same reasons set forth in the Foundation's RFRA claim. Further, the Foundation argues that the Final Rule violates the APA by (1) exceeding the EEOC's rulemaking authority, (2) unlawfully rewriting the PWFA's religious exemption, and (3) being arbitrary and capricious.

Having found that the Foundation demonstrated a likelihood of success on the merits of its RFRA claim, however, the Court need not reach a determination on the likelihood of success of its Free Exercise Clause and APA claims at this stage. *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) ("The plaintiff need only establish a likelihood of succeeding on the merits of any one of their claims." (cleaned up)); *D.M.*, 917 F.3d at 1003. Accordingly, the likelihood of success on the merits factor for issuing a preliminary injunction favors the Foundation.

### B. Irreparable Harm

The Foundation argues that the threat of irreparable harm is established because it is likely to succeed on the merits of its RFRA and Free Exercise Clause claims.[13] The EEOC argues that

---

exemption. (Doc. 15 at 26-27.) This provision of Title VII exempts from the "subchapter" any "religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religious to perform work connected with the carrying on by such [organization]." *See* 42 U.S.C. § 2000e-1(a) (incorporated in § 2000gg-5 of the PWFA). The Foundation argues the plain language of the exemption provision states that the PWFA does not apply to religious entities when it comes to employing individuals who do not meet the entities' religious practices. This too, if true, would support the argument that the EEOC's method is not the least restrictive means available and would give credence to the EEOC's authority to take a different approach. The Court need not decide this issue of statutory interpretation at this time, however.

[13] The Foundation does not, and could not, argue that the employee-time and economic costs associated with complying with the Final Rule establish irreparable harm. While the regulatory burdens are sufficient to establish standing pursuant to *Tennessee v. EEOC*, monetary harms generally do not establish irreparable harm for a preliminary injunction. *See Jet Midwest Int'l Co. v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1046 (8th Cir. 2020) ("[T]here is no threat of irreparable harm if the potential harm could be remedied by monetary damages."). The Court does, however, note that complying with the Final Rule

19

the Foundation cannot show a threat of irreparable harm for the same reasons it cannot establish standing and ripeness—specifically, that any harm is too speculative. Additionally, the EEOC points to the delay in the Foundation filing for preliminary injunction to counter the Foundation's claim of irreparable injury.

Showing the likelihood of success on the merits of a RFRA violation is generally sufficient to establish the threat of irreparable harm. *See Religious Sisters of Mercy*, 55 F.4th at 609 ("Other circuits are in agreement that 'establishing a likely RFRA violation satisfies the irreparable harm factor' . . . We agree with these courts." (citations omitted)). In *Religious Sisters of Mercy*, the Eighth Circuit concluded that a RFRA violation is sufficient to show irreparable harm in the context of a permanent, final injunction. *Id.* This principle has been applied by district courts in the preliminary injunction context as well. *See Cath. Benefits Ass'n*, 732 F. Supp. 3d at 1027 ("[T]he loss of freedoms guaranteed by . . . RFRA . . . constitute per se irreparable harm." (citing *Franciscan All.*, 47 F.4th at 380)). Thus, having found the Foundation likely to succeed on the merits of its RFRA claim, for which the Court has also found the Foundation has standing and which is ripe for judicial review, the Court concludes that it has shown a threat of irreparable harm in the absence of a preliminary injunction.

Nor is the EEOC's claim that the Foundation's delay in filing indicates a lack of irreparable harm compelling. A delay is significant if "harm has occurred, and the parties cannot be returned to the status quo." *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 998 (8th Cir. 2023) (citation omitted). The Court finds insignificant the roughly four-month delay between the Final Rule going into effect and the filing of this suit, and the additional two-month delay to perfect service and file a motion for preliminary injunction. The Foundation seeks to avoid irreparable harm to its right of free exercise of religion—this threat of harm can still be addressed and further injury avoided by entering a preliminary injunction at this time. Therefore, this is not a situation in which the delay impacts the Court's ability to return the parties to the status quo of the law before the Final Rule. *See Cath. Benefits Ass'n*, 732 F. Supp. 3d at 1027. The threat of irreparable harm factor favors the Foundation.

---

itself implicates the Foundation's religious beliefs, in addition to and apart from any merely economic harms.

## C.    Balance of Harms and Public Interest

Finally, the Court considers the balance of harms and public interest preliminary injunction factors. The "'balance of harms[]' requires the court to consider 'the balance between the harm [to the movant] and the injury that the injunction's issuance would inflict on other interested parties . . . .'" *See McLeodUSA Telcoms. Servs. v. Qwest Corp.*, 361 F. Supp. 2d 912, 921 (N.D. Iowa 2005) (citing *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 929 (8th Cir. 1994)). The balance of harms and public interest factors "merge when the Government is the party opposing the preliminary injunction." *Morehouse Enters., LLC v. BATFE*, 78 F.4th 1011, 1018 (8th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

In this case, the Court must weigh the potential irreparable harm stemming from the likelihood of success on the merits of the Foundation's RFRA claim and the harm to employees who may need accommodations for abortion in the workplace. "RFRA violations have been compared to First Amendment violations." *Cath. Benefits Ass'n*, 732 F. Supp. 3d at 1028 (citing *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012)). While a preliminary injunction could harm employees seeking accommodations for abortions, "the public is served by the preservation of constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 694 (8th Cir. 2008) (finding public interest served by issuing injunction where plaintiff showed likelihood of success on the merits of First Amendment claim), *overruled in part on other grounds*, *Phelps-Roper v. City of Manchester*, 697 F.3d 67 (8th Cir. 2012); *D.M.*, 917 F.3d at 1003-04 (finding public interest served by issuing injunction where plaintiff showed likelihood of success on the merits of Equal Protection Clause claim).

The EEOC also suggests that an injunction would harm the government because "any time a government is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (Doc. 19 at 31 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up)).)[14]  First, if such a harm to the government were prohibitive of issuing preliminary injunctive relief, that would in effect preclude any preliminary injunction sought against the government. Second, in balancing this alleged harm

---

[14] The Court further notes that the EEOC's argument on this point supports the Foundation's argument that it faces a credible threat of enforcement, in that the EEOC here is relying on its ability to effectuate the PWFA and Final Rule in arguing that being enjoined from doing so constitutes harm to the government.

to the government against the likely constitutional harm to the Foundation, the preservation of constitutional rights is paramount. Finally, in this particular case, since filing its suggestions in opposition, the EEOC has stated that, should the Court disagree with its arguments on ripeness and irreparable harm, "Defendants have no objection to the Court entering a preliminary injunction" so long as it comports with certain remedial limits set forth in the suggestions in support. (Doc. 45 at ¶ 8.) In light of this statement, the Court perceives that the threat of irreparable harm faced by the Foundation exceeds any potential harm to the EEOC from issuing a preliminary injunction.

The risk to constitutional rights in the absence of a preliminary injunction, evidenced by the Foundation showing a likelihood of success on the merits of its RFRA claim, tilts the balance of harms and public interest factors in favor of the Foundation.

## Conclusion

Accordingly, after careful consideration and for the reasons explained above, the Court **ORDERS** that Defendants' motion to dismiss, (Doc. 30), is **DENIED**; and the Foundation's motion for preliminary injunction, (Doc. 14), is **GRANTED**.

**IT IS FURTHER ORDERED** that the EEOC and its agents are enjoined from interpreting or enforcing the PWFA and any implementing regulations, including the Final Rule, against the Stanley M. Herzog Foundation[15] in a manner that would require it to accommodate abortions that are contrary to its sincere religious beliefs. Specifically, the EEOC and its agents are enjoined from (1) initiating any investigation into claims that the Foundation has failed to accommodate an abortion in violation of the PWFA and (2) issuing any Notice of Right to Sue with respect to the same.[16]

---

[15] The Court finds that the proper scope of preliminary injunction only extends to the parties in this case, given the fact-specific nature of the Foundation's religious beliefs pertaining to abortion with reference to the constitutional-rights harm and the likelihood of success on the merits of the Foundation's RFRA claim. *See United States v. Ali*, 682 F.3d 705, 710 (8th Cir. 2012) (noting even individuals of the same religion may have "inconsistent . . . interpretations" of religious doctrine).

[16] In the two preceding district court cases enjoining the Final Rule as it relates to abortion accommodations, the courts determined that the injunction should include a prohibition of issuing a Notice of Right to Sue. *See Cath. Benefits Ass'n*, 732 F. Supp. 3d at 1028-29, 1030 ("A letter to an employee from an agency detailing a right to sue is still a determination of the agency that the organization is not subject to a religious exemption, which would bar any suit."); *Louisiana*, 705 F. Supp. 3d at 664. The Court sees no reason to depart from these courts' approaches here.

22

Nothing in this Order shall prevent the EEOC or its agents from accepting a charge against the Foundation, serving notice of charges to the Foundation, or issuing a letter to employees saying the Foundation is covered under this injunction and an investigation is precluded.

**IT IS FURTHER ORDERED** that this Order shall take effect immediately, and absent further order of this Court, shall remain in effect until the conclusion of litigation in this case.

**IT IS SO ORDERED.**

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: March 18, 2025